## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS J. BELL, ANTHONY** | : | **CIVIL ACTION NO. 3:08-CV-1926** |
| **BERNARDI, JOSEPH DeANTONA,** | : | |
| **JOSEPH McCAWLEY, JAYME** | : | |
| **MORANO, PATRICK O'MALLEY,** | : | |
| **NICHOLAS PARISE, DOMINICK** | : | |
| **RINALDI, DOMINIC ROMANINI,** | : | |
| **BRUCE SMALLACOMBE, CHARLES** | : | |
| **SPANO, WILLIAM TONKIN, JR.,** | : | |
| **THOMAS GALELLA III, GARY** | ; | |
| **PROPERSI, and THOMAS** | : | |
| **HARRISON,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LACKAWANNA COUNTY, COREY** | : | |
| **O'BRIEN and MICHAEL WASHO** | : | |
| | : | |
| **Defendants** | : | |

------------------------------------------------------------------------------

| | | |
|---|---|---|
| **KENNETH KOVALESKI and** | : | **CIVIL ACTION NO. 3:08-CV-737** |
| **THOMAS BRADLEY,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LACKAWANNA COUNTY, COREY** | : | |
| **O'BRIEN and MICHAEL WASHO** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Shortly after a new administration took office in Lackawanna County in

January of 2008, the seventeen plaintiffs in these two actions, all of whom were

County employees who supported the prior administration, were terminated.  They

claim that Democratic County Commissioners Corey O'Brien and Michael Washo terminated them because of their affiliation with the Republican party, in violation of their First Amendment rights.  The Commissioners and the County deny this contention and move for summary judgment against all plaintiffs.  Were defendants motivated by partisan retribution in their decision to terminate these seventeen plaintiffs, or were plaintiffs' terminations merely a collateral consequence of the legitimate renovation of County government?  For the reasons that follow, the court concludes that a jury must provide the answer to this question.  Accordingly, the court will grant the motions in part, and deny the motions in part.

# I.   **Background**[1]

## A.   **Facts**[2]

Lackawana County is a political subdivision of the Commonwealth of

Pennsylvania governed under the provisions of a Home Rule Charter adopted in

1976. (No. 3:08-CV-1926 Doc. 116 ¶¶ 1-2; Doc. 159 ¶¶ 1-2; Doc. 117, Ex. A).[3]  Every

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the plaintiffs, the nonmoving party. See infra Part II.

The court notes that neither party complied with Local Rule 56.1. Although the parties submitted purported "undisputed statements of material fact" the submissions by both parties are rife with disputed facts and legal argument. Moreover, upon careful review of the record citations, the court notes that both parties have taken broad liberties in their recitation of the "undisputed facts" in the evidentiary record. For example, plaintiffs allege that Wayne Hiller, who purportedly replaced Romanini, was a political supporter of Washo and O'Brien and contributed $600 to defendants' campaign from 2007 through 2009. (Doc. 141, at 72-73). However, Mr. Hiller's contributions occurred in September 2008 and September 2009, after the 2007 Commissioner election. (Doc. 187, Ex. 36). Local Rule 56.1 is intended to assist the court in ruling upon a motion for summary judgment. Unfortunately, in this instance, the parties' submissions are of limited use, necessitating the court's verification of virtually every fact in the massive evidentiary record and causing significant delay to the resolution of these motions.

[2] The court declines to rely upon any preliminary injunction hearing or deposition testimony from 2004 case of Wrightson v. Lackawanna County, No. 3:04-CV-0038 (M.D. Pa.) (Judge Caputo), against Lackawanna County, and former Commissioners A.J. Munchak and Robert Cordaro. (See Doc. 117, Exs. B-J). Similarly, the court will not rely upon any testimony from the criminal proceedings against Cordaro, Munchak and Charles Costanzo. (See Doc. 211, Exs. AA, BB, GG, OO, PP, QQ). The testimony is inadmissible hearsay and does not fall within any exception, such as the rule on the admissibility of former testimony because there is no predecessor in interest to the plaintiffs in the instant matter with the opportunity and motive to develop the testimony. See FED. R. EVID. 801, 802, 804(b)(1).

[3] Unless otherwise noted, document references will be to documents docketed under Civil Action No. 3:08-CV-1926.

four years Lackawana County residents elect three County Commissioners. (Doc. 116 ¶ 3; Doc. 159 ¶ 3). Voters are permitted to cast votes for two Commissioners, and the three highest vote-getters are elected to the position of Commissioner. (Doc. 116 ¶ 4; Doc. 159 ¶ 4). The Home Rule Charter also dictates various facets of County operations, including the requirement that the Commissioners adopt a personnel code containing policies for employee hiring. (Doc. 116 ¶ 16; Doc. 159 ¶ 16). The Home Rule Charter explicitly mandates that all appointments shall be made on the basis of merit and fitness. (Doc. 116 ¶ 16; Doc. 159 ¶ 16).

Prior to the 2007 election, the County Commissioners were Robert Cordaro ("Cordaro"), Anthony (A.J.) Munchak ("Munchak"), both Republicans, and Michael Washo ("Washo"), a Democrat. Cordaro and Munchak both ran to retain their positions in the 2007 election. (Doc. 116 ¶ 19; Doc. 159 ¶ 19). Corey O'Brien ("O'Brien") joined Washo to form the Democratic ticket in the 2007 race. As part of their platform, Washo and O'Brien pledged to make county government more transparent and accessible; they promised to broadly advertise county employment opportunities and to seek applications for county employment from all eligible residents, an approach which they claim had not been attempted heretofore in the County. Washo and O'Brien also promised to operate government more efficiently and spend wisely. (Doc. 116 ¶¶ 20, 22; Doc. 159 ¶ 20, 22). Voters elected Washo, O'Brien and Munchak, effectively transferring the control of County government to the two Democrat County Commissioners who formed the majority. (Doc. 116 ¶ 23; Doc. 159 ¶ 23).

4

At the time of the 2007 election, all seventeen plaintiffs in these two actions were employed by Lackawanna County. (See No. 3:08-CV-1926, Doc. 20; No. 3:08-CV-0737, Doc. 1). Thomas Bell ("Bell") was the Lackawanna County Tax Assessment Administrator. (Doc. 20 ¶ 18). Anthony Bernardi ("Bernardi") held the position of Director of Personnel. (Id. ¶ 24). Joseph DeAntona ("DeAntona") was Director of Parks, Recreation and Sports. (Id. ¶ 30). Joseph McCawley ("McCawley") held the position of Fleet Manager and Risk Manager. (Id. ¶ 36). Jayme Morano ("Morano") was Director of Buildings and Grounds. (Id. ¶ 42). Patrick O'Malley ("O'Malley") was Assistant Director of Parks and Recreation. (Id. ¶ 48). Nicolas Parise ("Parise") held the title of Assistant Director of Buildings and Grounds. (Id. ¶ 54). Dominic Rinaldi ("Rinaldi") was employed by the County as Director of Purchasing. (Id. ¶ 60). Dominick Romanini ("Romanini") was a Grant Writer for the County. (Id. ¶ 66). Charles Spano ("Spano") held the position of Deputy Director of Voter Registration. (Id. ¶ 72). William Tonkin Jr. ("Tonkin") was Park Supervisor. (Id. ¶ 78). Bruce Smallacombe ("Smallacombe") was employed by the County as Director of Roads and Bridges. (Id. ¶ 84). Thomas Galella III ("Galella") held the title of GIS (Geographic Information Systems) Coordinator within the Assessor's Office. (Id. ¶ 89A). Gary Propersi ("Propersi") was Director of Hotel Tax/Personal Property Tax. (Id. ¶ 89G). Thomas Harrison ("Harrison") was employed as the Director of Tax Claims in the Tax Claims Department. (Id. 89M). Kenneth Kovaleski ("Kovaleski") held the position of Assistant Public Defender. (No. 3:08-CV-0737, Doc. 1 ¶ 9). Finally, Thomas Bradley

5

("Bradley") was employed as the Director of Veterans Affairs. (Id. ¶ 15).  The vast majority of these seventeen men were registered Republicans, and all supported the Republican party and its candidates in the 2007 Commissioner election.  (See No. 3:08-CV-0737, Doc. 1 ¶¶ 14, 19; No. 3:08-CV-1926, Doc. 20 ¶¶ 19, 25, 31, 37, 43, 49, 55, 61, 67, 73, 79, 85, 89B, 89H, 89N).

After the election and prior to taking office, Washo and O'Brien learned that the County faced a serious and potentially devastating budget shortfall of $8 million dollars. (Doc. 116 ¶ 24; Doc. 159 ¶ 24).  They established between 12 and 15 committees to review all County departments and related functions.  (Doc. 116 ¶ 25; Doc. 159 ¶ 25).  Washo and O'Brien directed Elizabeth Randol ("Randol"), their campaign manager and incoming Chief of Staff, to notify, *inter alios*, these plaintiffs that the new Commissioners intended to open up their positions, and solicit applications by posting the jobs on a website and advertising the positions in the local newspaper. (Doc. 116 ¶ 39; Doc. 159 ¶ 39).  Randol informed existing employees that they were welcome to apply for their current positions or to seek new positions, but that they must formally apply and be interviewed.  (Doc. 117, Ex. L, at 93-95).

On December 11, 2007, and January 4, 2008, Washo and O'Brien placed advertisements in the local newspaper for numerous County positions.  (Doc. 116 ¶¶ 35, 36; Doc. 159 ¶¶ 35, 36).  The advertisements provided an internet address where Washo and O'Brien posted job descriptions for the open positions that had been prepared for Washo and O'Brien by a human resources consultant.  (Doc. 116 ¶ 37;

6

Doc. 159 ¶ 37; Doc. 173, Ex. 19, at 213-17).  Disclaimers on the advertisements stated that the job summaries were not intended to be formal job descriptions or to contain a complete list of responsibilities and qualifications for the positions.  (Doc. 117, Ex. U; Doc. 173, Ex. 19, at 214).

As part and parcel of the analysis of County employment opportunities and practices, O'Brien created the "Washo-O'Brien Hiring Chart."  (Doc. 188, Ex. 50; Doc. 175, Ex. 23, at 96-100).  O'Brien claims that this chart is a budgetary document. It lists those County employees who were terminated and those who were hired hired, along with job titles and salaries.  (Doc. 188, Ex. 50; Doc. 175, Ex. 23, at 96-100).  Washo and O'Brien retained certain individuals (department heads) that minority County Commissioner Munchak supported for retention, all of whom backed the Cordaro-Munchak campaign in the 2007 election.  (Doc. 116 ¶¶ 32, 33; Doc. 159 ¶¶ 32, 33).

On January 7, 2008, Commissioners Washo, O'Brien and Munchak were sworn into office.  (See Doc. 117, Ex. L, at 25).  Simultaneously, fourteen of the named plaintiffs in this action were terminated from the County.  (See Doc. 23 ¶¶ 20, 26, 32, 38, 44, 50, 56, 62, 68, 74, 80; Doc. 185, Ex. 29E ¶ 26, Ex. 29F ¶ 19, Ex. 29J ¶ 19).  With respect to the remaining three, Kovaleski's employment with the County ended February 12, 2008 (Doc. 185, Ex. 29G ¶ 24); Bradley was terminated March 10, 2008 (Doc. 184, Ex. 29C ¶ 19); and Smallacombe's termination was effective April 12, 2008.  (Doc. 23 ¶ 86).  None of the 17 plaintiffs was offered a position through the hiring process conducted by Washo and O'Brien and each filed a claim for

7

unemployment compensation after termination of employment.[4]  (Doc. 116 ¶ 44;

Doc. 159 ¶ 44).  The County's express reason for termination, as set forth on the

unemployment forms for each plaintiff, was "change of administration," except for

Smallacombe, whose form referenced "lack of work" as the reason for termination.

(Doc. 189, Ex. 51; Doc. 191, Ex. 57).

### B.   **Procedural History**

The plaintiffs in <u>Kovaleski v. Lackawanna County</u> (Civ. A. No. 3:08-CV-0737)

instituted the first lawsuit in these consolidated matters.  Plaintiffs Kenneth

Kovaleski and Thomas Bradley filed their complaint on April 21, 2008, against

Lackawanna County, O'Brien and Washo.  (<u>No. 3:08-CV-0737</u>, Doc. 1).[5]  Pursuant to

42 U.S.C. § 1983, plaintiffs allege violations of their First Amendment rights to free

speech and association, First Amendment retaliation and violations of their

Fourteenth Amendment equal protection and due process rights.  (<u>Id.</u> ¶¶ 35-38).

Plaintiffs also assert a state law claim for wrongful termination in violation of public

policy, and request punitive damages against Washo and O'Brien.  (<u>Id.</u> ¶¶ 41-43).

On October 20, 2008, Thomas Bell, Anthony Bernardi, Joseph DeAntona,

Joseph McCawley, Jayme Morano, Patrick O'Malley, Nicholas Parise, Dominic

---

[4]  The facts related to each plaintiff's job duties and termination are
described <u>infra</u>.

[5]  Craig Kalinoski was also named as a plaintiff in the original complaint.
(<u>See</u> <u>No. 3:08-CV-0737</u>, Doc. 1).  On February 10, 2010, Kalinoski moved to sever his
case from the other 17 plaintiffs in these two actions.  (Doc. 23).  The court granted
the motion on February 11, 2010.  (Doc. 24).

Rinaldi, Dominick Romanini, Bruce Smallacombe, Charles Spano, and William Tonkin Jr. filed their initial complaint in this litigation against Lackawanna County, O'Brien and Washo. (No. 3:08-CV-1926, Doc. 1). With leave of court, the plaintiffs filed an amended complaint on April 17, 2009 (Doc. 20), adding Thomas Galella III, Gary Propersi and Thomas Harrison as plaintiffs. Like Kovaleski and Bradley, these plaintiffs allege, pursuant to 42 U.S.C. § 1983, violations of their First Amendment rights to free speech and association, First Amendment retaliation and violations of their Fourteenth Amendment equal protection and due process rights. (Id. ¶¶ 113-114, 118-120). Plaintiffs similarly assert a state law claim for wrongful termination in violation of public policy, and request punitive damages against Washo and O'Brien. (Id. ¶¶ 124-125).[6]

The Honorable Thomas Vanaskie initially presided over both matters and on January 29, 2009, consolidated the Bell and Kovaleski cases for purposes of discovery. (See Doc. 14). Both matters were reassigned to the undersigned on June 29, 2010 (No. 3:08-CV-0737) and July 14, 2010, respectively. (No. 3:08-CV-1926, Doc. 38).[7]

---

[6] The court notes three additional lawsuits filed by former employees of Lackawanna County related to the 2007 Commissioners election. See Nolan v. Lackawanna County, Civ. A. No. 3:09-CV-2567 (M.D. Pa.) (Judge Caldwell); Kalinoski v. Lackawanna County, Civ. A. No. 3:10-CV-314 (M.D. Pa.) (Judge Caputo) and Arnone v. Lackawanna County, Civ. A. No. 3:10-CV-301 (M.D. Pa.) (Magistrate Judge Mannion).

[7] These matters were reassigned to the Honorable Robert D. Mariani, on November 17, 2011, but were returned to the undersigned on December 13, 2011 as a result of a disqualifying conflict.

On February 15, 2011, defendants filed individual motions for summary judgment for each of the 17 plaintiffs. (See No. 3:08-CV-0737, Docs. 34, 38; No. 3:08-CV-1926, Docs. 56, 60, 64, 68, 72, 76, 80, 84, 88, 92, 96, 100, 104, 108, 112). On February 21, 2011, plaintiffs moved to disqualify defense counsel on the basis of an alleged conflict of interest revealed through the summary judgment motions. (See Doc. 119). Thereafter, the court stayed briefing on the summary judgment motions pending resolution of the motion to disqualify. (Doc. 121). The court denied the motion on June 7, 2011, and issued a new briefing schedule. (Docs. 129, 130). Plaintiffs filed a single, comprehensive brief in opposition to defendants' motions on August 25, 2011. (Doc. 141). Defendants filed reply briefs on October 24, 2011. (No. 3:08-CV-0737, Docs. 56, 57; No. 3:08-CV-1926, Docs. 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208). That same day, defendants also filed motions to strike the declarations submitted by plaintiffs in support of their opposition to summary judgment. (No. 3:08-CV-0737, Doc. 58; No. 3:08-CV-1926, Doc. 212). The parties filed briefs in opposition and reply briefs on November 4, and November 21, 2011, respectively. (No. 3:08-CV-0737, Docs. 60, 61; No. 3:08-CV-1926, Docs. 214, 215). All nineteen motions have been fully briefed and are ripe for disposition.

## II.   **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P.

56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence

must be adequate, as a matter of law, to sustain a judgment in favor of the non-

moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-

57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89

(1986); see also FED. R. CIV. P. 56(a), (c), (e).  Only if this threshold is met may the

cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

**III.**   **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a

means to redress violations of federal law committed by state officials.  See 42

U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory of the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress. . . .

Id.  Section 1983 is not itself a source of substantive rights but instead provides a

method for vindicating rights secured elsewhere in federal law.  Gonzaga Univ. v.

Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

In order to prevail, a § 1983 plaintiff must demonstrate that the defendant, while

acting under the color of state law, deprived the plaintiff of a federal constitutional

or statutory right.  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006).[8]

As the motions to strike bear upon evidence relevant to the court's consideration of the summary judgment motions, the court will address the motions to strike first.

### A.    <u>Motions to Strike Plaintiffs' Declarations</u>

Defendants move to strike the declarations of each plaintiff submitted in Exhibits 29A through 29P (<u>see</u> Docs. 184, Exs. A-E; Doc. 185, Exs. F-M; Doc. 186, Exs. N-P) to their brief in opposition to the motions for summary judgment.  (Doc. 212).[9]  Defendants assert that the declarations were not provided to them despite interrogatory requests and requests for production of documents containing "any and all statements of any party to this action . . . relating or pertaining to the allegations" in the complaint.  (Doc. 213, at 3).  Defendants assert that plaintiffs had a duty to supplement their discovery responses by providing the declarations to defendants.  (<u>Id.</u> at 4).  Defendants further contend that the declarations contain material inappropriate for a declaration, namely beliefs and opinions, inadmissible

---

[8]  Plaintiffs assert equal protection claims in their complaints, <u>see</u> <u>No. 3:08-CV-737</u>, Doc. 1 ¶ 37; <u>No. 3:08-CV-1926</u>, Doc. 20 ¶ 120, but plaintiffs have not adduced any evidence to establish equal protection violations.  In addition, plaintiffs, who are all at-will employees (with the exception of Galella), have no property interest in their positions and, thus, have no due process rights prior to termination.  <u>See</u> <u>Demko v. Luzerne Cnty. Cmty. Coll.</u>, 113 F. Supp. 2d 722, 728 (M.D. Pa. 2000).  The equal protection and due process claims are baseless; therefore, the court will grant summary judgment in favor of the defendants on these claims.

[9]  The court notes that the motions to strike and supporting and opposing briefs in both cases are identical.  (<u>Compare</u> <u>No. 3:08-CV-1926</u>, Docs. 212-215, <u>with</u> <u>No. 3:08-CV-737</u>, Docs. 58-61).

hearsay and conclusory speculation, as opposed to factual assertions.  (Id. at 5-7).[10]

Plaintiffs respond that the declarations are merely a compilation or synthesis of

information contained in the evidentiary record and that they were not required to

---

[10]  Defendants contend that each declaration incorporates five identical
paragraphs which contain no facts but only opinions or conclusory speculation.
(See Doc. 213, at 4-5).  The following five paragraphs are found in 14 of the 16
declarations:

> (1)   I was terminated because of my association with and speech in support
>       of the Republican candidates for Lackawanna County Commissioners.
> (2)   Defendants Washo and O'Brien knew of my political persuasion.
> (3)   The unemployment compensation form filled out by Lackawanna
>       County even acknowledges that the reason I was terminated was
>       because of a "change in administration."  See UC Form, attached
>       hereto as "Exhibit 1."
> (4)   In addition, on January 7, 2008, a huge number of Lackawanna County
>       employees were terminated.  Those employees were primarily
>       Republicans.  A handful of those employees were Democrats who had
>       supported the Republican county commissioners in the election.
>       Those employees included all the plaintiffs in this action plus
>       Republicans Craig Kalinoski, Thomas Nolan, Thomas Jones and
>       Christopher Arnone.
> (5)   That so many Republican supporters of Republicans were summarily
>       terminated reveals Lackawanna County's and Democratic
>       Commissioner defendants Washo's and O'Brien's knowledge that they
>       were terminating political supports of their opponents.  It also shows
>       their preparation and plan formulated prior to being sworn into office
>       to fire the supporters of their political opponents.

(See Doc. 184, Ex. 29A ¶¶ 29-33, Ex. 29B ¶¶ 27-28, 31-33, Ex. 29D ¶¶ 25-26, 28-30; Doc.
185, Ex. 29E ¶¶ 29-30, 32-34, Ex. 29F ¶¶ 21-22, 25-27, Ex. 29G ¶¶ 26-30, Ex. 29H ¶¶ 27-
31, Ex. 29I ¶¶ 29-30, 32-34, Ex. 29J ¶¶ 29-30, 32-34, Ex. 29K ¶¶ 21-25, Ex. 29L ¶¶ 21-22,
24-26; Doc. 186, Ex. 29M ¶¶ 26-30, Ex. 29O ¶¶ 29-30, 32-34, Ex. 29P ¶¶ 24-25, 27-29).
The declaration of Thomas Bradley includes paragraphs 1, 2, 4 and 5 above,
but paragraph three reads slightly differently: "The unemployment compensation
form filled out by Lackawanna County states that the reason I was terminated was
because my position was 'eliminated due to departmental reorganization.'" (Doc.
184, Ex. 29C ¶¶ 21-22, 24, 26-27).  Similarly, the declaration of Bruce Smallcombe
includes paragraphs 1, 2 4 and 5, above but does not contain a paragraph
concerning unemployment compensation forms.  (Doc. 186, Ex. 29N ¶¶ 22-23, 25-26).
There is no declaration for Jayme Morano.

product the declarations prior to filing because they constitute classic work product and are not discoverable under Federal Rule of Civil Procedure 26(b)(3)(A). (See Doc. 214).

The court will first address defendants' contention that the declarations should be stricken in their entirely for violating discovery rules. Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery. See FED. R. CIV. P. 26. The scope of discoverable material is broad, but certain materials are protected from discovery. The work product doctrine, originating from the United States Supreme Court case of Hickman v. Taylor, 329 U.S. 495 (1947), and later promulgated in Rule 26, protects certain materials made or prepared by an attorney or his agent in anticipation of litigation. See FED. R. CIV. P. 26(b)(3); Hickman, 329 U.S. 495. Rule 26(b)(3)(A) states in pertinent part: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative    . . . ." except upon a showing of substantial need and undue hardship. FED. R. CIV. P. 26(b)(3)(A). "Core" or "opinion" work product, which encompasses "mental impressions, conclusions, opinion, or legal theories of an attorney," is subject to even greater protection and is discoverable only in rare and exceptional circumstances. See In re Cendant Corp. Sec. Litig., 343 F.3d 658, 663 (3d Cir. 2003) (internal citation and quotation omitted).

The failure to produce discoverable material in a timely fashion may result in sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. The rule

dictates that when a party fails to provide information "as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c).

The circumstances under which a declaration, either in draft or final form, is appropriately deemed undiscoverable attorney work product is not altogether clear. See Murphy v. Kmart Corp., 259 F.R.D. 421, 428 (D.S.D. 2009) (noting court division on issue of whether affidavit of witness drafted by attorney constitutes attorney work product). Some courts find that unexecuted, draft declarations merely denote what an attorney thinks a party or witness will state, and therefore constitute attorney work product. See Judicial Watch, Inc. v. U.S. Dept. of Commerce, 201 F.R.D. 265, 269-70 (D.D.C. 2001). Some courts also consider signed declarations to be work product, and hence privileged, until the moment they are filed with the court. See Intel Corp. v. VIA Technologies, Inc., 204 F.R.D. 450, 452 (N.D. Cal.

2001);[11] <u>Tierno v. Rite Aid Corp.</u>, No. C 05-02520, 2008 WL 2705089, at *4 (N.D. Cal. July 8, 2008) (quoting <u>Intel Corp.</u>, 204 F.R.D. at 452). Others still conclude that any work product protection that an affidavit or declaration may have disappears once the affiant or declarant signs the document. <u>See</u> <u>Tuttle v. Tyco Elec. Installation Servs., Inc.</u>, NO. 2:06-cv-581, 2007 WL 4561530, at *2 (S.D. Ohio Dec. 21, 2007) ("Affidavits are normally not protected by the work product doctrine for the very reason that an affidavit 'purports to be a statement of facts within the personal knowledge of the witness, and not an expression of the opinion of counsel.'"

---

[11]  In <u>Intel Corp.</u>, the court addressed whether Rule 26(a) disclosure requirements required a party to disclose a declaration submitted in support of its motion for summary judgment. The court deemed the declaration to be work product until the moment it was filed. The court also concluded that a declaration did not fall within the purview of "documents" that must be disclosed pursuant to Rule 26:

> In form, a declaration resembles a "document." In substance, however, it is testimony. To be precise, it is a convenient proffer, in written form, of anticipated oral trial testimony. This is the appropriate way to lay before a court the relevant universe of trial testimony so that a determination can be made whether there is any fact issue for a jury. As the deadline for summary judgment nears in any civil case, it is customary for counsel to solicit declarations from certain trial witnesses. In this process, it would be unreasonable and burdensome (and rarely, if ever, done in practice) to require all sides to augment any privilege logs or disclosure lists each and every time they obtain a declaration for potential use on summary judgment. The "documents" referred to in FRCP 26(a)(1)(B) are letters, memos, calendars, e-mails, written contracts, and the like. An affidavit may be a "document" within the meaning of the rule in some unusual instances, but the classic declaration gathered in anticipation of a summary-judgment motion is not within the purview of the "document" concept.

<u>Intel Corp.</u>, 204 F.R.D. at 451-52.

(citation ommitted)); <u>see</u> <u>also</u> <u>Walker v. George Koch Sons, Inc.</u>, Civ. A. No.

2:07cv274, 2008 WL 4371372, at *5 (S.D. Miss. Sept. 18, 2008).

Both parties direct the court to <u>Doe v. Luzerne County</u>, Civ. A. No. 3:04-1637,

2008 WL 2518131 (M.D. Pa. June 19, 2008). In <u>Doe</u>, the court held that the

declaration of a third-party witness could not be regarded as the work-product of an

attorney. <u>Id.</u> at *4. Plaintiffs claim that <u>Doe</u> is inapplicable because it involved the

declaration of a witness, whereas the instant matter involves declarations generated

by attorneys and signed by *parties* to the litigation, thus bringing them within the

ambit of Rule 26(b)(3)(A), which protects documents "prepared in anticipation of

litigation or for trial by or for another party." (Doc. 214, at 12). In fact, most if not

all of the cases cited above involve affidavits or declarations obtained from third-

party witnesses, not parties to the litigation itself. <u>See</u> <u>e.g.</u>, <u>Murphy</u>, 259 F.R.D. at

431 (concerning third-party witness affidavits); <u>Intel Corp.</u>, 204 F.R.D. 450

(declaration of witness); <u>Tuttle</u>, 2007 WL 4561530 (witness affidavits).

The court finds this distinction relevant and concludes that plaintiffs were

not required to disclose the declarations prior to filing. <u>Intel Corp.</u>, 204 F.R.D. at

452. To be pellucidly clear, the court is persuaded by and adopts the *ratio decidendi*

of <u>Intel Corp.</u>, <u>supra</u>. Furthermore, assuming *arguendo* that counsel was required

to disclose the declarations upon their execution by plaintiffs, the failure to disclose

the declarations was harmless. The vast majority of factual averments in the

declarations concern well-known and undisputed facts in this litigation, such as

hiring and termination dates, job descriptions, and political affiliation. (<u>See</u> <u>e.g.</u>,

Doc. 184, Ex. 29A ¶¶ 2-5, 10, 24, 25, 27).  Accordingly, the court will deny the motion to strike the declarations in their entirety.

Defendants also move to strike specific averments on the grounds that the averments constitute improper opinion and belief.  A declaration is "[a] formal, written statement . . . that attests, under penalty of perjury, to facts known by the declarant."  BLACK'S LAW DICTIONARY 468 (9th ed. 2009).  Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).[12]  The Third Circuit has interpreted the rule to require an affiant to state facts, rather than opinions and conclusions.  Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985).  "Statements of belief, no matter how sincere, are properly subject to a motion to strike because they do not meet the personal knowledge requirement."  Summy-Long v. Pa. State Univ., Civ. A. No. 1:06-cv-1117, 2009 WL 811616, at *2 (M.D. Pa. Mar. 26, 2009) (citing Fowler v. Tillman, 97 F. Supp. 2d 602, 607 (D.N.J. 2000)).

The court has carefully reviewed the paragraphs highlighted by defendants and it is clear that they represent the opinions and beliefs of the plaintiffs, not facts

---

[12]  Rule 56 was amended on December 1, 2010.  The cited text of 56(c)(4) previously resided in subpart (e)(1) of Rule 56.  Case law referring to Rule 56(e)(1) remains relevant to newly amended Rule 56(c)(4).  See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1305 n.22 (11th Cir. 2011).

within their personal knowledge.  For example, each declaration states that the

plaintiff was terminated for his association with, and speech in support of, the

Republican candidates for Lackawanna County Commissioners and that the

motivation for plaintiffs' terminations was partisan retribution.  Such statements

are clearly personal opinions, not facts within the personal knowledge of the

plaintiffs.  Each plaintiff's belief that his termination was summary and based upon

politics is not a fact—it is the very issue in this case—and therefore not appropriate

content for a declaration.  See FED. R. CIV. P. 56(c)(4); Summy-Long, 2009 WL

811616, at *2.  The purpose of a declaration is to set out facts, not each plaintiff's

belief about what the facts establish.  The court will therefore grant the motion to

strike in part and strike the four or five paragraphs of each of the 16 declarations

that contain personal opinions and beliefs.[13]  They will not be considered as part of

the court's summary judgment analysis.

## B.    Partial Summary Judgment Motion?

Plaintiffs' complaints assert violations of First Amendment free association

and speech rights as well as a state-law wrongful termination cause of action and a

request for punitive damages against Washo and O'Brien.  (Doc. 20 ¶¶ 118-120, 124-

---

[13]   The court notes that each declaration contains a conclusory heading that reads "My Job Was Not Policymaking and Did Not Involve Discretionary Functions."  Nevertheless, paragraphs which follow the heading contain predominantly factual assertions about each plaintiff's duties and responsibilities. (See e.g. Doc. 184, Ex. A ¶¶ 6-23).  The court will parse these paragraphs and consider the properly stated factual assertions as part of its summary judgment analysis.

126; No. 3:08-CV-0737, Doc. 1 ¶¶ 113, 114, 118-120, 124, 125).  Plaintiffs contend that

defendants' motions seek only partial summary judgment in that they fail to

address plaintiffs' First Amendment free speech claims.  (Doc. 141, at 1 n.1, 42).

Defendants reply that plaintiffs "merely make conclusory assertions that they

engaged in speech or 'supported' incumbents.  They do not assert that they spoke

out either in the media or to Washo or O'brien regarding their political beliefs.

Accordingly, their (ambiguous) speech claim merges into an association claim."

(Doc. 209, at 15).

    A public employee's speech claim is governed by the balancing test set forth

in Pickering v. Board of Education of Township High School District 205, 391 U.S.

563 (1968).[14]  An association claim alleging termination on the basis of political

affiliation is analyzed under the doctrine set forth in Elrod v. Burns, 427 U.S. 347

(1976) and Branti v. Finkel, 445 U.S. 507 (1980).

    In their declarations and depositions, each plaintiff alleges some form of

political speech in favor of the Republican Commissioners during the 2007 election,

---

    [14]  The Pickering balancing test involves three considerations, which the
Third Circuit has described as follows:

> First, the employee must demonstrate that the speech involves a
> matter of public concern and the employee's interest in the speech
> outweighs the government employer's countervailing interest in
> providing efficient and effective services to the public.  Next, the
> speech must have been a substantial or motivating factor in the alleged
> retaliatory action.  Finally, the employer can show that it would have
> taken the adverse action even if the employee had not engaged in
> protected conduct.

Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004).

such as campaigning for the Republican Commissioners, canvassing neighborhoods with campaign literature, volunteering on committees, wearing campaign paraphernalia, introducing candidates to voters, recruiting poll workers, placing signs around the county and on personal property, making financial contributions to the campaign, placing phone calls, sending letters, speaking at, organizing, and attending rallies, fund-raisers, parties and functions in support of the Republican Commissioners, and hosting such events.  (Doc. 184, Ex. 29A ¶ 25, Ex. 29B ¶ 24, Ex. 29C ¶ 18, Ex. 29D ¶ 22; Doc. 185, Ex. 29E ¶ 25, Ex. 29F ¶ 18, Ex. 29G ¶ 23; Ex. 29H ¶ 24, Ex. 29I ¶ 26, Ex. 29J ¶ 26, Ex. 29K ¶ 18, Ex. 29L ¶ 18, Ex. 29M ¶ 23; Doc. 186, Ex. 29N ¶ 19, Ex. 29O ¶ 26; see also Doc. 165, Ex. 9, at 50, 51).

These activities clearly implicate First Amendment speech rights. Defendants do not address the Pickering balancing test in their motions for summary judgment or supporting briefs.  Consequently, the court concludes that defendants have not moved for summary judgment on plaintiffs' First Amendment speech claims.[15]

### C.  Political Patronage Discrimination

To establish a prima facie case of political patronage discrimination in violation of the First Amendment rights to speech and association, each plaintiff

---

[15]  The court would be remiss if it did not note a dearth of evidence establishing that defendants were aware of these speech activities for most of the plaintiffs.  To demonstrate a violation of their First Amendment rights, plaintiffs will have to show that defendants knew of the plaintiffs' speech activities and that those activities were a substantial or motivating factor in their terminations. Curinga, 357 F.3d at 310.

must establish that: (1) he was employed at a public agency that does not require political affiliation; (2) he was engaged in constitutionally protected conduct; and (3) such conduct was a substantial or motivating factor in the government's employment decision.  Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007).  When plaintiffs establish a prima facie case, the County and defendant Commissioners may avoid liability by establishing that the same employment action would have been taken in the absence of protected activity.  Id. (citing Stephens v. Kerrigan, 122 F.3d 171, 176 (3d Cir. 1997)).

Defendants contend that they are entitled to summary judgment against each plaintiff on grounds that none of the plaintiffs can establish a *prima facie* case of political patronage discrimination.  With respect to the first prong, defendants assert that plaintiffs received their positions as part of past administrations' patronage hiring and cannot show that they held their positions regardless of political affiliation or that their positions were purely apolitical.  Defendants further contend that plaintiffs fail to meet their burden under the third prong of showing their political affiliation was a substantial or motivating factor in their termination. Defendants point to: (1) their campaign promise to make government open and accessible—which included the elimination of the alleged patronage hiring methods of their predecessors—and (2) the $8 million dollar budget shortfall as the bases for their decision to reorganize and restructure county departments and county positions.

22

Finally, defendants contend that they have satisfied their burden of showing that they would have made the same decision regardless of plaintiffs' political affiliation, that is, defendants assert that they have established the same decision defense with respect to every plaintiff.  Defendants posit that they have stayed true to their campaign promises and have adopted an apolitical approach, selecting only the best qualified individuals for open positions regardless of party affiliation.

Plaintiffs respond that there are disputed issues of fact regarding whether each plaintiff's position required political affiliation.  In particular, plaintiffs note that at Lackawanna County's 30(b)(6) deposition the County admitted that political affiliation was not an important factor for the positions held by plaintiffs.  (Doc. 141, at 25).  With respect to the second prong, plaintiffs contend that they engaged in constitutionally protected conduct, namely being registered Republicans or supporters of the Republican candidates and engaging in speech in support of Republican County Commissioners.  (Id. at 27).  Finally, plaintiffs contend that they have put forth sufficient evidence on the third prong to establish a prima facie case that their political affiliation was a substantial or motivating factor in their terminations.  Plaintiffs highlight the timing and number of terminations, that fourteen were terminated on Washo and O'Brien's first day in office, unemployment compensation documents wherein the County purportedly listed as the reason for termination "change in administration," alleged statements of retaliation by defendants and their agents, the Washo-O'Brien Hiring Chart listing individuals to be terminated and their replacements, and statements from Republican

23

Commissioner Munchak that the plaintiffs' terminations were political.  (Doc. 141, at 29-32).

### 1.   Whether Plaintiffs' Employment Required Political Affiliation

Political affiliation may be a perfectly appropriate basis for hiring or firing when the vacant position is deemed to be "policymaking," rendering political affiliation relevant to effective performance of the office involved.  See Galli, 490 F.3d at 271; Branti, 445 U.S. at 518.  To determine whether political affiliation is an appropriate consideration, the court should consider factors such as "whether the employee has duties that are non-discretionary or non-technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire and fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers."  Id. (citing Brown v. Trench, 787 F.2d 167, 169 (3d Cir. 1986)).  The court must review and consider the intended "functions of the office in question and not the actual past duties of the particular employee involved.'"  Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 397 (3d Cir. 1998) (citations and quotations omitted); see also O'Connor v. Steeves, 994 F.2d 905, 911 (1st Cir. 1993) ("[T]he actual past duties of the discharged employee are irrelevant if the position *inherently* encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance.").  Most important is whether the employee has meaningful input into decisionmaking regarding the nature and scope of a major governmental program.

24

Galli, 490 F.3d at 271 (citing Armour v. County of Beaver, PA, 271 F.3d 417, 429 (3d Cir. 2001). Ultimately, this inquiry is fact-specific. See McGroarty v. City of Wilkes-Barre, 311 Fed. App'x 553, 554 (3d Cir. 2009) (citing Waskovich v. Morgano, 2 F.3d 1292, 1297 (3d Cir. 1993)).

The plaintiff carries the initial burden of establishing that his or her position does not require political affiliation. When a governmental entity claims that a discharge is proper because political affiliation is central to the job itself, the burden shifts to the government. Galli, 490 F.3d at 271 (citing Armour v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)); Delhagen v. McDowell, 703 F. Supp. 2d 467, 474 (M.D. Pa. 2010).

Defendants generally assert that plaintiffs obtained their County government employment through a patronage system of the previous administration and, therefore, plaintiffs cannot meet their threshold burden. Assuming *arguendo* that prior administrations considered each individual's political affiliation when plaintiffs were hired, plaintiffs are not precluded, *ex proprio vigore*, from establishing that their positions do not require political affiliation. The question under the first prong of a political patronage discrimination claim is not whether plaintiffs initially received their positions based in part on their political affiliation, the question is whether policy determinations or related oversight are essential functions of the office.

Defendants also specifically assert that the positions held by Bernardi, Bradley, DeAntona, Harrison, Morano, Parise, Propersi, Rinaldi, and Smallacombe

are policymaking positions for which political affiliation is an appropriate

consideration.  Given the fact-specific nature of the policymaking inquiry, the court

will address the circumstances of each plaintiff *seriatim*.  See Galli, 490 F.3d at 271.

### i.   **Bernardi**

Bernardi was employed by Lackawanna County as the Personnel Director

from 1988 to 2000 and again from 2004 until his termination in January 2008.  (Doc.

61 ¶¶ 2-5; Doc. 143 ¶¶ 2-5).  Defendants contend that Bernardi reviewed all County

hiring and termination decisions and supervised the county workforce of

approximately 1200 employees, thereby rendering his political affiliation an

appropriate consideration for his office.  (Doc. 61 ¶¶ 12-13).  Moreover, defendants

observe that the new position created to handle Bernardi's prior duties clearly

involves the exercise of independent decision and policy-making authority.  (Doc.

63, at 13-14).

Plaintiffs counter that Bernardi did not control hiring because the

Commissioners retain ultimate control of all hiring.  Plaintiffs observe that

Bernardi did not prepare a budget, and that he merely supervised a staff of two

employees—a personnel assistant and an administrative assistant.  (Doc. 160, Ex. 2

at 26-28; Doc. 184, Ex. 29B ¶ 8).  Bernardi testified his deposition that he did not

prepare an employee handbook, and asserted that he was never consulted by the

Commissioners for input into employee policies for the County.  (Id. at 45).  When

Bernardi applied for a position in the Washo-O'Brien administration, Bernardi

described his job duties as follows:

26

> Responsible for managing all functions of the personnel department. Advise and assist department heads and elected officials on all areas of personnel management. Develop and implement personnel programs and establish operating policies and procedures. Responsible for overseeing payroll functions for the county. Responsible for and experienced in negotiating all seven union contracts for the county (Chief Negotiator). Responsible for recruiting, interviewing and placing both professional and non-professional applicants throughout the county. Familiar with grievance procedures as well as grievance arbitration . . . Responsible for all fringe benefit programs for county employees. Developed job descriptions and performance evaluations in accordance with ADA

Doc. 62, Ex. B).

Bernardi's initial description of his job duties and his subsequent deposition testimony are somewhat inconsistent, but it does not appear Bernardi had hiring and firing authority or prepared a budget. The Lackawanna County representative testified at her Rule 30(b)(6) deposition that the position of Deputy Director of Human Resources, the position to which all of Bernardi's duties were transferred, is not one for which political affiliation would be an appropriate consideration. (Doc. 170, Ex. 18 at 32). On this record, there is, at minimum, a factual dispute as to the scope of Bernardi's authority and whether political affiliation would be an appropriate consideration for his position. Thus, summary judgment is inappropriate.

### ii.   **Bradley**

Bradley became Director of Veterans Affairs for Lackawanna County in 2004 on a part-time basis. (No. 3:08-CV-737, Doc. 39 ¶ 1). Pursuant to Pennsylvania law,

the County must appoint a Director of Veterans Affairs to carry out certain statutorily defined duties.  See 16 P.S. § 1923.

Defendants contend that Bradley's position as Director of Veterans Affairs was independent of the authority of the County Commissioners by virtue of this statutory fiat.  Hence, defendants argue that Bradley performed his duties at his discretion—squarely within the definition of a policymaking position.  (No. 3:08-CV-0737, Doc. 41, at 7).  Defendants allege that Bradley was the only individual certified to make claims on behalf of veterans, that he handled the representation of veterans at hearings and that he initiated various programs, including an outreach program.  (Id. at 7-8).  In Adams v. Rodfong, the Pennsylvania Court of Common Pleas of Beaver County held that the Director of Veterans Affairs position was not a policymaking position.  7 Pa. D. & C. 3d 463 (Pa. Ct. Comm. Pleas 1978).  The court, in determining whether the position of Director of Veterans Affairs was entitled to high public official immunity, held that the provisions of 16 P.S. § 1923 do not vest the Director of Veterans Affairs with policy-making functions.  Id. at 467.  The Adams court observed: "On the contrary the director's duties are primarily to 'assist' the commissioners and to implement the public policy laid down by them and the legislature."  Id.  This court concurs with the Adams court analysis that the Director of Veterans Affairs is a position entirely subordinate to the County Commissioners.  Accordingly, the court finds that the position of Director of Veterans Affairs is not one for which political affiliation would be an appropriate consideration.  Bradley thus satisfies the first prong of his claim.

28

### iii.   **DeAntona**

DeAntona served as the Lackawanna County Director of Parks and Recreation from January 2004 until his termination in January 2008. (Doc. 65 ¶ 13; Doc. 144 ¶ 13). Defendants contend that DeAntona had meaningful and direct influence in operating and administering the County parks and recreation programs. (Doc. 67, at 7). Specifically, they claim that DeAntona supervised an entire department, emphasizing that his position was considered cabinet level by the prior administration. Defendants posit that he "had full discretion on where to assign employees working under him and what priorities to identify to formulate his Department's budget, a budget over which he had sole discretion to spend." (Doc. 67, at 8). DeAntona responds that despite his title as Director, he did not hire any employees for his department. He acknowledges that he supervised a staff of over 20 employees and assigned employees to specific positions. (Doc. 65 ¶¶ 14, 15; Doc. 144 ¶ 14, 15). DeAntona also testified at his deposition that he had no input into the budget for the department, in "any policy-type thing[s]" or with staff hiring. (Doc. 161, Ex. 4, at 62-63).

As previously noted, the court finds that opinions of prior administrations as to whether particular jobs constitute "policymaking positions" hold limited precedential value, particularly when departments are reorganized and various duties are shifted from one position to another. Such opinions may be probative, but they are certainly not dispositive, of the issue. DeAntona oversaw a staff of 20-30 employees and assigned them various responsibilities, but there is a factual

29

dispute as to DeAntona's level of authority and policymaking functions, created by DeAntona's own testimony compared to that of former Commissioners and the present defendants. Accordingly, the court finds that summary judgment is inappropriate with respect to DeAntona on the first prong of his political patronage discrimination claim.

### iv.   <u>Harrison</u>

At the time of the 2007 Commissioner election Harrison was employed for the County as the Director of the Tax Claim Bureau.  (Doc. 113 ¶ 2; Doc. 146 ¶¶ 2).  The Director is responsible for collecting delinquent taxes from 40 municipalities in the County, which amounts to approximately $8 million dollars each year.  (Doc. 113 ¶ 24; Doc. 146 ¶ 24).  As Director, Harrison formulated a budget for his department and supervised a staff of seven.  (Doc. 113 ¶¶ 27-28; Doc. 146 ¶ 27-28).

Defendants assert that the Director position was a department leadership position and that the prior administration believed it to be a policymaking position that turned over in a new administration.  (Doc. 113 ¶ 23).  They assert that Harrison had "unfettered independence and discretion" in running his department and how it collected taxes.  (<u>Id.</u> ¶ 25).  In response, plaintiffs counter that Harrison's duties are prescribed by statute, his secretary prepared the budget, and Harrison did not report to the Commissioners simply because there was no need to do so – the Treasurer's Office reported the amount of delinquent taxes collected.  (Doc. 163, Ex. 6, at 20-23).  Defendants further assert that Harrison regularly exercised his discretion when he entered into agreements with delinquent taxpayers.  Harrison

30

responds that Pennsylvania law circumscribes the types of agreements he could enter into with delinquent taxpayers.  (Doc. 113 ¶ 30; Doc. 146 ¶ 30; Doc. 163, Ex. 6, at 25-26).

On this record, there are disputed issues of as to whether Harrison's position was one for which political affiliation is an appropriate consideration.

## v.   **Morano**

Morano held the position of Director of Buildings and Grounds.  (Doc. 73 ¶ 8; Doc. 149 ¶ 8).  Defendants argue Morano's position involved substantial policymaking because he directed all operational issues attendant to County-owned buildings.  (Doc. 75, at 7).  Indeed, as Director of Buildings and Grounds, Morano supervised a staff of no fewer than 18 employees.  (Doc. 73 ¶ 10; Doc. 149 ¶ 10).  However, Morano testified that he had no input into the department budget.  (Doc. 165, Ex. 9, at 43).  It also appears that he lacked any hiring authority.  From the duties described, the court cannot say that "a difference in party affiliation would be 'highly likely to cause [Morano] to be ineffective in carrying out' the duties of the position."  Boyle v. County of Allegheny, 139 F.3d 386, 396 (3d Cir. 1998) (quoting Ness v. Marshall, 660 F.2d 517, 521 (3d Cir. 1981).  Political affiliation is not an appropriate consideration for Morano's position; thus, he can establish the first element of his claim.

vi.   **Parise**

Parise held the title of Assistant Director of Buildings and Grounds under the Director, Morano.  (Doc. 81 ¶ 1; Doc. 150 ¶ 1).[16]  Parise had a security badge granting him access to all County buildings.  (Doc. 81 ¶ 9; Doc. 150 ¶ 9).  Defendants contend that although Parise held the title of Assistant Director, he performed departmental head duties.  (Doc. 83, at 2).  He managed a staff of 40, made policy for the department, exercised supervision over department rules, procedures and employee performance.  (Id. at 4).  Parise's description of his duties included: effective communication of rules, procedures, and safety methods; implementation and maintenance of various practices and programs; the planning and monitoring of daily staff schedules; the management of administrative functions, revenue and expenses; and the appropriate resolution of employee performance problems.  (Doc. 81 ¶ 19; Doc. 150 ¶ 19).  Parise instituted policy changes resulting in a more efficient use of manpower and smoother operation of the department and created the department budget.  (Doc. 81 ¶¶ 30-31; Doc. 150 ¶¶ 30-31).  Plaintiffs emphasize that Parise engaged in little independent decisionmaking, had no authority to speak in the name of the Commissioners, and had virtually no influence on programs.  (Doc. 141, at 64-65; Doc. 185, Ex. 29J ¶¶ 6-24).  This testimony coupled with the County

---

[16] Curiously, the County assigned Parise the title of Assistant Director of Parks and Recreation and his salary was paid out of the Department of Parks and Recreation budget; however, his effective position remained Assistant Director of Buildings and Grounds, and he never performed services in any capacity on behalf of the Department of Parks and Recreation.  (Doc. 81 ¶¶ 14-16; Doc. 150 ¶¶ 14-16).

representative's testimony that political affiliation is not an appropriate

consideration for the positions of Deputy Director of Maintenance or the Director of

Public Works (the reorganized positions encompassing Parise's former duties), (see

Doc. 170, Ex. 18, at 39, 40), provides sufficient evidence to create a factual dispute as

to the policymaking nature of Parise's position.  Summary judgment is therefore

inappropriate on the basis of the first prong of Parise's claim.

### vii.   Propersi

Propersi held the position of Director of Hotel Tax.  (Doc. 109 ¶ 12; Doc. 151 ¶

12).  Propersi's duties included administering an ordinance allowing the County to

collect a hotel room rental tax of 4% on every hotel stay in the County.  (Doc. 109 ¶

18; Doc. 151 ¶ 18).  Propersi mailed tax return forms to hotels and followed up with

hotels that failed to send timely payment, and prepared a report indicating the

amount of collections.  (Doc. 109 ¶ 19; Doc. 151 ¶ 19).  Propersi was the sole

individual in his department and he reported to Commissioner Cordaro and the

administration's Chief of Staff.  (Doc. 167, Ex. 12, at 23-24).

Nothing about these duties suggest that party affiliation is an appropriate or

essential consideration for the position.  Propersi had no staff, performed no hiring

and firing, made no policy and had no input into decisionmaking of a major

program.  Pursuant to County ordinance, he mailed out tax forms and prepared a

report on his collections.  Defendants themselves describe Propersi's duties as

"rote" and "routine." (Doc. 111, 12).[17]  The position of Director of Hotel Tax is not one for which political affiliation is an appropriate consideration. Thus, Prosperi can establish the first element of his political patronage discrimination claim.

### viii.  **Rinaldi**

Rinaldi worked for the County as Director of Purchasing.  (Doc. 85 ¶ 1; Doc. 152 ¶ 1).  Upon his hire in 2003, Cordaro and Munchak instructed him to centralize all purchasing and requisitioning for the County into one office.  (Doc. 85 ¶ 9; Doc. 152 ¶ 9).  Rinaldi's job duties consisted of managing a six-member staff, processing all bids and requisitions for all Lackawanna County entities, preparing contracts, negotiating bids and contracts, processing purchase orders and requests for information, awarding bids, and assuring compliance with department policy and procedure.  (Doc. 85 ¶ 10; Doc. 152 ¶ 10).  Based upon Rinaldi's description of his actual duties, defendants assert that Rinaldi provided meaningful input into the nature and scope of a major program, to wit: the purchasing program of the County under the auspices of an $86 million dollar budget.  (Doc. 87, at 6).  Rinaldi developed and implemented the policies for his department and maintained

---

[17]  Defendants repeatedly refer to Propersi's prior position with the County as Director of the Tax Claims Bureau, a position taken over by plaintiff Harrison. (See Doc. 111, at 8-9).  It appears that defendants' focal argument may be that Propersi held a policymaking position when he held the position of Director of Tax Claims. Propersi's duties and level of policymaking, if any, in that position are irrelevant to his termination and to whether political affiliation was an appropriate consideration for the position that he held at the time of his termination—Director of Hotel Tax.

significant authority through his direct contacts with vendors and bidders.  (Id. at 7).

In response, plaintiffs argue that "Rinaldi's job was simply to get the best price for goods or services; it was not to make or contribute to policy decisions." (Doc. 141, at 61).  Rinaldi did not prepare a budget for the operation of his department and did not have authority to hire or terminate employees, nor was he authorized to speak on behalf of the Commissioners.  (Doc. 185, Ex. 29L ¶¶ 7, 8, 10). Rinaldi's testimony, juxtaposed with the County representative's testimony that political affiliation is not an essential consideration for the position of Deputy Director of Purchasing (see Doc. 170, Ex. 18, at 38-39), creates a factual dispute precluding summary judgment on Rinaldi's claim.

### ix.   Smallacombe

Smallacombe became the Director of Roads and Bridges for the County in January 2004.  (Doc. 93 ¶¶ 1, 4, 7; Doc. 154 ¶¶ 1, 4, 7).  In the position, Smallacombe assessed all the County roads and bridges and prioritized construction and repair efforts.  (Doc. 168, Ex. 15 at 30-31).  He also oversaw several large scale repair and improvement projects.  (Doc. 93 ¶ 12; Doc. 154 ¶ 12).  His initial staff of six employees grew throughout his tenure as Director of Roads and Bridges.  (Doc. 168, Ex. 15, at 25-26, 31).  Defendants contend that Smallacombe's position is one for which political affiliation is an appropriate consideration because he had meaningful input into decision making for "the operation and maintenance of the entirety of the County-owned road and bridge network."  (Doc. 95, at 6).

Smallacombe counters that prioritizing department projects did not render him a policy maker. (Doc. 141, at 62). Smallacombe was not required to establish and support a departmental budget as the department was funded by the liquid fuels tax. (Doc. 93 ¶ 9; Doc. 154 ¶ 9). Smallacombe also notes that he did not have authority to hire or fire employees and "was not invited to participate in any meetings relating to the management of the Department." (Doc. 186, Ex. 29N ¶¶ 7, 8). Clearly, factual issues abound as to whether Smallacombe exercised policymaking authority, which precludes summary disposition.

## x.   **Remaining Plaintiffs**

With respect to the remaining plaintiffs, defendants do not contend that they held policymaking positions for which political affiliation would be an appropriate consideration. Instead, defendants generally aver that plaintiffs cannot establish that they held apolitical positions because the prior administration hired them based, in part, upon their political affiliation, and the prior administration considered plaintiffs' positions as policy driven, logically necessitating turn over in any new administration. (See Doc. 118, at 7, 9, 13-14, 15, 19; Doc. 209, at 3, 14-15; see also Doc. 59, at 6-7; Doc. 79, at 6-7; Doc. 99, at 7-8; Doc. 103, at 7-8).

As previously noted, the perspective of a prior administration that specific positions encompass policymaking responsibilities is only marginally relevant.[18]

---

[18]   For example, the court notes with interest that the Supreme Court has specifically stated that Assistant Public Defender (plaintiff Kovaleski) is *not* a position for which political affiliation is an appropriate consideration. See Branti v. Finkel, 445 U.S. 507, 519 (1980) ("[I]t is manifest that the continued employment of

Moreover, the Lackawanna County representative testified with respect to every remaining plaintiff that political affiliation would not be an appropriate consideration for their positions or the positions to which their responsibilities had been transferred under the new administration.[19]  See Boyle v. County of Allegheny, Penn., 139 F.3d 386, 398 (3d Cir. 1998) (stating that case law "supports the conclusion that statements by a hiring authority to the effect that political affiliation is not a proper requirement for a particular government position are indeed significant").

The court concludes that all remaining plaintiffs have put forth sufficient evidence to establish the first prong of a political patronage claim; at minimum, there are material factual disputes as to the scope of each plaintiff's actual influence and authority thereby defeating summary judgment on this element.  Galli, 490 F.3d at 272.

---

an assistant public defender cannot properly be conditioned upon his allegiance to the political party in control of the county government.").

[19]  Maria Elkins testified on behalf of the County that political affiliation would not be an appropriate consideration for the positions materially altered by restructuring and reorganization.  (See Doc. 170, Ex. 18, at 27 (Assistant Public Defenders), 29 (Director of Veterans Affairs), 30-32 (Deputy Director of Assessment; Tax Assessment Administrator), 33-34 (Deputy Director of Human Resources), 37-38 (Deputy Director Parks & Recreation), 38 (Risk Manager), 38-39 (Deputy Director of Purchasing), 39 (Director Department of Public Works), 40 (Deputy Director of Maintenance), 43 (Deputy Director of Purchasing), 43-44 (Grant Writer), 44-45 (Deputy Director Roads and Bridges), 45-46 (Voter Outreach Specialist), 48-49 (Parks Supervisor/Manager), 51 (GIS positions); Doc. 171, Ex. 18, at 52 (Deputy Director Tax Claims/Hotel Tax)).

### 2. **Constitutionally Protected Conduct**

In ostensible agreement, the parties breeze by the second prong of a political patronage claim, that plaintiffs engaged in constitutionally protected activity. To be sure, plaintiffs have put forth sufficient evidence that they were, at all times relevant and material, registered Republicans or associated with the Republican candidates for Commissioner in the 2007 election, and engaged in political activities.[20] Suffice it to say that associating with a political party and engaging in partisan activities are constitutionally protected under the First Amendment. See e.g., Philadelphia Fire Fighters' Union Local 22 v. City of Philadelphia, 286 F. Supp. 2d 476, 480 (E.D. Pa. 2003) ("Expression in the political arena occupies the core of First Amendment protection.").

### 3. **Substantial or Motivating Factor in Employment Decision**

The final prong of a political patronage discrimination claim requires plaintiffs to show that their constitutionally protected conduct was a substantial or motivating factor in the termination of their employment. This prong requires a

---

[20] Plaintiffs engaged in activities including campaigning for the Republican Commissioners, canvassing neighborhoods with campaign literature, volunteering on committees, wearing campaign paraphernalia, introducing candidates to voters, recruiting poll workers, placing signs throughout the county, making financial contributions to the campaign, placing phone calls, sending letters, speaking at, organizing, and attending, or even hosting, rallies, fund-raisers, parties and other campaign functions in support of the Republican Commissioners. (See Doc. 184, Ex. 29A ¶¶ 24-26, Ex. 29B ¶¶ 23-24, Ex. 29C ¶¶ 17-18, Ex. 29D ¶¶ 21-22; Doc. 185, Ex. 29E ¶¶ 24-25, Ex. 29F ¶¶ 17-18, Ex. 29G ¶¶ 22-23, Ex. 29H ¶¶ 23-24, Ex. 29I ¶¶ 25-26, Ex. 29J ¶¶ 25-26, Ex. 29K ¶¶ 17-18, Ex. 29L ¶¶ 17-18, Ex. 29M ¶¶ 22-23; Doc. 186, Ex. 29N ¶¶ 18-19, Ex. 29O ¶¶ 25-26; Doc. 165, Ex. 9, at 50-51).

showing of both knowledge on the part of defendants as to the constitutionally protected conduct of plaintiffs and a causal connection between the protected conduct and plaintiffs' termination.  Galli, 490 F.3d at 275.  This element may be established through direct or circumstantial evidence.  See Delhagen, 703 F. Supp. 2d at 476 (citing Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 664 (3d Cir. 2002)).  Defendants contend that plaintiffs cannot establish that political affiliation was a substantial or motivating factor in defendants' decision to terminate plaintiffs' employment given the apolitical nature of defendants' fiscally driven decisions to restructure and reorganize departments, and to eliminate positions, all of which flowed inexorably from the County's eight million dollar budget deficit.

### i.   **Knowledge**

There is evidence, scattered throughout the record, of defendants' knowledge of plaintiffs' political affiliation or support for the Republican Commissioners in the 2007 election.  For example, Morano testified that Washo stated to him "You're killing me with all those signs in Olyphant," in reference to the signs Morano placed in support of Cordaro and Munchak in the Borough of Olyphant.  (Doc. 165, Ex. 9, at 52).  Indeed, defendants expressly contend in defense of these claims that plaintiffs received their employment as a result of a corrupt political patronage system and their connections to Republican Commissioners Munchak and Cordaro.

At minimum, based upon the record, a reasonable jury could conclude that defendants viewed each plaintiff as a Republican supporter.[21]

###    ii.    Causation

Defendants assert that plaintiffs cannot establish a causal link between their political affiliation and their terminations.  Defendants argue that the *tour de force* of their campaign was the promise to make County government more open and accessible and to fill County positions through an open hiring process.  Upon election, Washo and O'Brien created 12 to 15 committees for the purpose of analyzing the functions of County departments.  To improve the efficiency of governmental service and to remedy the looming $8 million dollar budget shortfall, defendants reorganized departments and restructured and eliminated various positions.  Thereafter, defendants advertised all vacant positions in the local newspaper.  Defendants emphasize that they interviewed a number of the plaintiffs for open positions and that they retained two high level employees who were supporters of the Cordaro and Munchak in the 2007 election.  Specifically, defendants retained Thomas Durkin, campaign finance director for Cordaro and Munchak, and Harry Lindsay.  Defendants also note that they retained every individual that minority Commissioner Munchak recommended to them.

---

[21] The court observes that defendants assert lack of knowledge of political affiliation only with respect to four plaintiffs: McCawley, Rinaldi, Romanini, and Smallacombe.  (See Doc. 71, at 8; Doc. 87, at 10; Doc. 91, at 7; Doc. 95, at 10).

Plaintiffs counter that "reorganization and restructuring" were merely code words used to terminate supporters of the Republican Commissioners. They allege that the Washo-O'Brien Hiring Chart (Doc. 188, Ex. 50) identifies the individuals hired to replace each plaintiff, many of whom were hired at higher salaries. (Id.)

Several factors, applicable to all plaintiffs support a finding of causation. First, the sheer number of terminations on the first day or shortly thereafter Washo and O'Brien took office is some evidence from which a jury could find that defendants terminated plaintiffs on the basis of their protected conduct. See Marchese v. Goldsmith, No. 92-6954, 1994 U.S. Dist. LEXIS 7940, at *14 (E.D. Pa. June 13, 1994) (timing of termination relevant to motive); Delhagen v. McDowell, 703 F. Supp. 2d 467, 476-77 (M.D. Pa. 2010) (noting timing of termination in the causation analysis). Second, unemployment compensation forms filled out by the County list the reason for plaintiffs' terminations as "change of administration." (Doc. 189, Ex. 51).[22] Third, Minority Commissioner Munchack testified that plaintiffs' terminations were political and he was given no input into the decisions. (Doc. 174, Ex. 22, at 21-38). In addition, contrary to defendants' assertion of

---

[22] Bernardi filled out his unemployment compensation form and stated the reason for separation from employment as "change of administration." (Doc. 160, Ex. 2, at 62). Defendants allege that Bernardi's secretary filled out these forms on behalf of the County and simply copied the notation from Bernardi's form into every unemployment compensation form. Thus, defendants deny that the forms constitute evidence of their motive for terminating plaintiffs. Upon review of the record, the court finds that there is a dispute of fact as to the source of the "change of administration" notation. Taken in the light most favorable to plaintiffs, the forms are probative evidence, albeit of a limited nature, that plaintiffs were terminated on the basis of their political affiliation. (See Doc. 189, Ex. 51).

41

performance-based reasons for the termination of certain plaintiffs, none of the letters informing plaintiffs of their termination indicates any such reasoning. (See Doc. 188, Ex. 49; Doc. 191, Ex. 61).  The letters simply state that the plaintiff's employment has been terminated, or that the plaintiff's position was eliminated as part of a departmental reorganization.  (Id.)  Finally, plaintiffs note that Lindsay and Durkin, who Washo and O'Brien contend were retained despite their support of Munchak and Cordaro, made political contributions to Washo and O'Brien. (See Doc. 141, at 70-71).[23]

With this general evidence of causation in mind, the court now turns to a more individualized analysis of causation, as each plaintiff must establish the prong in order to proceed with his claim of political patronage discrimination.

---

[23] Plaintiffs assert that defendants' contention about retaining Cordaro and Munchak supporters is "not completely true." (Doc. 141, at 70). Plaintiffs allege that these individuals made campaign contributions to Washo and O'Brien "from 2007 through 2009." (Id.) In actuality, it is plaintiffs' assertion that is "not completely true." The relevant political contributions did not occur until 2008 and 2009, *after* the 2007 Commissioner election. (See Doc. 187, Ex. 41 at 39-40 (Lindsay contributions on 2/24/08 and 8/23/08); Doc. 186, Ex. 33 (Durkin contributions 2/9/08 and 9/6/09 (wife))).

Plaintiffs also advance this "not completely true" statement with respect to some of the individuals hired to replace plaintiffs. For example, plaintiffs allege that Wayne Hiller, who replaced Romanini, contributed $600 to defendants' campaign from 2007 through 2009. (Doc. 141, at 72-73). However, Mr. Hiller's contributions occurred in September 2008 and September 2009, again *after* the 2007 Commissioner election. (Doc. 187, Ex. 36). Similarly, plaintiffs contend that Kent Wuestling, who replaced Tonkin, contributed $130 to Washo and O'Brien from 2007 through 2009, but Wuestling made only one contribution in February 2008, once again post election. (Doc. 188, Ex. 48). Despite these inaccuracies, the Court acknowledges that all campaign contributions have some modicum of probative value as to whether Washo and O'Brien replaced plaintiffs solely for political patronage.

*Bell and Galella*

Bell was employed for the County as Assistant Administrator in the Tax

Assessor's Office.  (Doc. 57 ¶ 1; Doc. 142 ¶ 1).  His duties included administering tax

laws within the real estate function of Lackawanna County and assisting with the

pending reassessment.  (Doc. 57 ¶ 12; Doc. 142 ¶ 12).  Most of his time was devoted

to the reassessment, working in conjunction with the outside vendor hired by the

County to perform the reassessment.  (Doc. 57 ¶¶ 13-14; Doc. 142 ¶¶ 13-14).  Galella

worked in the Assessor's Office in the position of GIS (Geographic Information

Systems) Coordinator.  (Doc. 105 ¶¶ 1, 17; Doc. 145 ¶¶ 1, 17).  Some of his duties also

involved assisting in the reassessment effort.  (Doc. 105 ¶¶ 20-21; Doc. 145 ¶¶ 20-21).

The County, Washo and O'Brien all testified that Bell and Galella were

terminated as a result of the restructuring of the Assessment Office and the

discontinuation of the reassessment effort.  (Doc. 172, Ex. 19, at 50; Doc. 175, Ex. 23,

at 82; Doc. 181, Ex. 28, at 66).  In particular, the County testified that it combined

responsibilities, reduced staff size, and eliminated the GIS Coordinator position.

(Doc. 172, Ex. 19, at 114-116).  Randol testified on behalf of the County that the

County was not technologically equipped to handle the type of GIS coordination

required for the reassessment.  (Id.)[24]  Thus, the County decided to forego the

_____

[24] Plaintiffs contend that the Lackawanna County representative's testimony
regarding the decision to contract out the reassessment and, as a result, reduce staff
size is hearsay.  (See Doc. 145 ¶¶ 40, 41, 44).  This contention is meritless.  The
County is a party, this is its deposition testimony concerning the Assessor's Office
and it does not include any statements made by other individuals.  At trial, a
representative of the County would be quite competent to testify as to the

43

reassessment, thereby negating the need for Bell's and Galella's positions.  (Doc.

173, Ex. 19, at 225).

On a performance level, Washo stated that he had observed Bell's work ethic

when he was minority Commissioner in the Cordaro-Munchak administration.

Washo claimed that Bell spent over one quarter of his day at a restaurant, thus his

attendance and attentiveness were problematic.  (Doc. 181, Ex. 28, at 65-66).  Washo

could not recall, however, if he informed either Bell's boss or Munchak about his

observations of Bell, nor does he recall speaking personally to Bell about his

concerns.  (Id. at 68-69).

---

restructuring of the Assessor's Office.  Pursuant to Rule 56, the court is required to examine deposition testimony to determine whether there are material disputes of fact precluding summary judgment.  Taken to its logical conclusion, plaintiffs would argue that *every* deposition transcript submitted as evidence for summary judgment is inadmissible hearsay.  With remarkable audacity, a mere two paragraphs later plaintiffs cite *the exact same testimony* to support *the exact same proposition*—that the County contracted out the reassessment function to an outside agency.  (Doc. 145 ¶ 46).

In a similar vein, defendants cite to transition team reports with respect to the reorganization of the Assessor's Office.  (See Doc. 105 ¶ 39).  Plaintiffs argue that there is no foundation or authentication for these documents, (see Doc. 145 ¶ 39), yet plaintiffs have submitted transition team reports as an exhibit to their brief in opposition to summary judgment and rely on them for various propositions. (See Doc. 190, Ex. 55; Doc. 151 ¶ 26 (citing to Exhibit 55 – the transition team reports – and stating that "[n]one of the transition team reports indicated in [sic] that Mr. Propersi should be terminated, that the position should be eliminated or that the collection of hotel tax took only five hours or any limited amount of time"); see also Doc. 159 ¶ 25).  Which begs the question for plaintiffs' counsel: Are the reports unauthenticated documents lacking foundation or viable evidence to disprove defendants' contentions? Plaintiffs' counsel is hereby admonished for these glaring inconsistencies, and advised to refrain from such submissions in the future.

Unsurprisingly, Bell views the change in administration quite differently.
After reading an advertisement in the newspaper for a position in the Assessor's
Office, Bell submitted an application and received an interview.  (See Doc. 160, Ex.
1 at 54-57).  Bell claims his interview was a sham: O'Brien asked him about two
specific issues—reassessment and appeal—and Washo, although present, did not
participate at all.  (Id. at 55).  Bell also notes that according the Washo-O'Brien
Hiring Chart, he was replaced by John Foley.  (Doc. 188, Ex. 50, at 3).  Foley, who
had the title of Deputy Director of Appraisals, was a political supporter of Washo
and O'Brien, and received a salary significantly higher (an additional $18,400) than
Bell's.  (Doc. 188, Ex. 50, at 3; Doc. 187, Ex. 35).

Galella disputes defendants' contention that his position was eliminated.
Galella asserts that defendants created a GIS position to service a number of
departments including the Assessor's Office, Emergency Management Planning,
Voter Registration and Strategic Planning.  (Doc. 172, Ex. 19, at 161-162; Doc. 181,
Ex. 28, at 110-112).  Galella also claims that in October 2007, Washo ominously told
him: "I just want to tell you, when we win [the Commissioners election], you're in
for a big surprise."  (Doc. 162, Ex. 5, at 41-44).  Galella understood Washo's
statement to mean that he would be fired.

Taking the evidence in the light most favorable to the non-moving parties,
both Bell and Galella have put forth sufficient evidence from which a reasonable
jury could conclude that they were terminated on the basis of their political
affiliation.  Bell's contention that his interview was a sham, combined with the

45

Washo-O'Brien Hiring Chart and the lack of any merit-based reason in his personnel record, the timing of his termination and the unemployment compensation form all create a dispute of fact as to the cause of his termination. Similarly, there are indications that Galella's position was not eliminated and Washo made statements arguably probative of the reason for Galella's termination. Material factual disputes render summary judgment unwarranted with respect to Bell and Galella.

### *Bernardi*

Bernardi held the title of Director of Personnel.  Defendants eliminated the Personnel Department and transferred the Personnel Director's duties to the position of Deputy Director of Human Resources in the newly created Human Resources Department.  (See Doc. 175, Ex. 23, at 57).  More importantly for the purposes of the instant motion, the County representative testified that Bernardi's termination was merit-based.  (See Doc. 117, Ex. L, at 53-55).  In response to the Commissioners' request for department-based information, Bernardi could not provide an organizational chart or job descriptions for County positions. In addition, the County representative testified that Bernardi had not updated the employee manual which dated back to 1978; consequently, there were no functioning policies governing critical issues such as travel and sexual harassment avoidance.  (Id.) O'Brien testified similarly.  (See Doc. 175, Ex. 23 at 57-62).[25]

---

[25]  Plaintiffs claim that both Randol, on behalf of the County, and O'Brien, testified that Bernardi was terminated simply because the title of his position was

Bernardi counters that there is no documentation expressing any

dissatisfaction with Bernardi or his performance.  (Doc. 172, Ex. 19, at 57).  His

letter of termination makes no mention of performance issues, stating only that his

employment was terminated.  (Doc. 188, Ex. 49).  In addition, Commissioner

Munchak testified that there is no functional difference in the duties of the former

Department of Personnel and the new Department of Human Resources.  (Doc. 175

Ex. 22, at 56-57).

The court finds that summary judgment is warranted with respect to

Bernardi.  It is undisputed that Bernardi failed to update the 1978 version of the

employee manual, and that the County lacked even the most basic employee

---

modified from Personnel Director to Deputy Director of Human Resources.  (See
Doc. 143 ¶ 30).  Yet again, the plaintiffs' counsel has inaccurately cited the record.
While Randol and O'Brien testified in depositions that the Personnel Department
was eliminated and replaced with a Human Resources Department, and that the
duties of the Personnel Director were transferred to the position of Deputy Director
of Human Resource, both testified, quite explicitly, that they believed Bernardi to
be incompetent for the position due to his failure to create or produce any County
policies, manuals, or organizational charts despite holding the position of Personnel
Director for approximately 20 years.  (See Doc. 117, Ex. L, at 53-55; Doc. 175, Ex. 23,
at 57-62).

Plaintiffs also claim that Washo testified that Bernardi was terminated
"simply because he was part of the culture of the previous Republican
administration."  (Doc. 143 ¶ 34).  Washo testified generally about a "culture of
corruption" that he believed permeated the prior administration, but he never
testified that Bernardi was terminated simply because he was part of the culture.
To the contrary, when asked whether the "culture of corruption" was one of the
reasons for the termination of the plaintiffs, Washo responded "It meant that — no.
It meant that we had to be extraordinarily careful and judicious as we interviewed
people and as we considered people for various positions.  It's not why people were
dismissed."  (Doc. 183, Ex. 28, at 209).  Thus, the record support for plaintiffs' claim
is rather evanescent.

policies addressing travel and sexual harassment avoidance.   Taking as true that there is no difference in the duties or functions of the former Department of Personnel and the new Department of Human Resources, the facts establish that Bernardi's performance in that position was woefully inadequate.  That he was unable to produce the core documents for a personnel department, such as job descriptions, is particularly troublesome.  On this record, there is insufficient evidence from which a reasonable jury could find that defendants terminated Bernardi on the basis of his support for the Republican administration. Accordingly, the defendants are entitled to summary judgment on this claim.[26]

### *Bradley*

When defendants entered office, the Department of Veterans Affairs had both a Director of Veterans Affairs (Bradley)—a part-time position—and an Executive Director of the County's Office of Veterans Affairs—a full-time position. (No. 3:08-CV-0737, Doc. 39 ¶ 6; Doc. 40, Ex. A, at 41-42; Doc. 157 ¶ 6; Doc. 117, Ex. L, at 41-42).  Defendants assert that they reorganized the department and created one full-time Director in lieu of the previous two positions.  (Doc. 176, Ex. 23, at 198-199). Apparently, Bradley was the "odd man out" as the result of this reorganization. Defendant Washo also testified that minority Commissioner Munchack informed him that Bradley was a difficult employee.  (Doc. 180, Ex. 28, at 53).  Indeed, Bradley had one serious personnel-related matter–a grievance submitted by a

---

[26] Hereinafter, the court's references to all plaintiffs is exclusive of Bernardi.

48

secretary in the Office of Veteran's Affairs claiming Bradley made inappropriate comments to her.  (Doc. 176, Ex. 23, at 198; Doc. 40, Ex. D).  Defendants argue in the alternative that Bradley's absence from the position from November 2007 to March 2008 due to his FMLA leave (Doc. 40, Ex. B) and Bradley's failure to apply for the advertised position of Director of Veterans Affairs broke any causal link between Bradley's political activity and defendants' decision to hire a full-time Director. (No. 3:08-CV-0737, Doc. 41, at 12).

Plaintiffs admit that Bradley was employed in the position of Director on a part-time basis, but they contend that there is no evidence that Bradley was unable or unwilling to work full-time.  Bradley asserts that defendants replaced him with a "vocal supporter" of the incoming Commissioners.  (Doc. 161, Ex. 3, at 63).  In addition, Bradley notes that his termination letter indicates that his position was eliminated due to department reorganization.  (Doc. 188, Ex. 49).  Given that the Director position is a statutorily required position, see 16 P.S. § 1923, and that the position was not eliminated as there is currently a Director of Veterans Affairs, there is sufficient evidence on causation to present the matter to a jury for resolution.[27]

---

[27]  The court notes that this ruling is without prejudice to defendants' argument that Bradley's position was consolidated with the Executive Director position.  To be pellucidly clear, this argument remains viable and may be presented to the jury.

## *DeAntona, O'Malley and Tonkin*

Defendants restructured the Department of Parks and Recreation. This restructuring implicated the positions of DeAntona, the Director of Parks, O'Malley, Assistant Director of Parks and Recreation, and Tonkin, Parks Supervisor.[28] Upon review of the matter, defendants established the new office of Deputy Director of Parks and Recreation, which they envisioned as a position with greater responsibilities than the pre-existing Director of Parks and Recreation. (Doc. 172, Ex. 19, at 60-61, 66). The Assistant Director position and Parks Supervisor position were revamped into Buildings and Grounds Manager and Recreational Programs Manager. (See Doc. 172, Ex. 19, at 66-67; Doc. 188, Ex. 50, at 5).

DeAntona applied for the position of Deputy Director of Parks and Recreation in the Washo-O'Brien administration, but defendants did not interview him. According to defendants, DeAntona did not have the qualifications essential to the position. (Doc. 65 ¶ 28; Doc. 144 ¶ 28; Doc. 175, Ex. 23, at 80-81). Defendants note that the person hired for the position had the desired background in landscape architecture, which DeAntona lacked. (Doc. 175, Ex. 23, at 80-81). In addition to his lack of qualifications, defendants introduce performance problems with DeAntona—namely his alleged absences from work during the middle of the day to

---

[28] Tonkin testified that his title was Parks Supervisor, but County records reflect that his position was Assistant Director in the Department of Parks and Recreation. (Doc. 208, Ex. A).

go to the gym and a cigar club, and his purported misuse of county property for personal business.  (See Doc. 175, Ex. 23, at 81; Doc. 181, Ex. 28, at 75-77).

DeAntona counters that his personnel record is devoid of any evidence of performance problems.  (See Doc. 172, Ex. 19, at 60-61, 62; Doc. 181, Ex. 28, at 77-80).  DeAntona further notes that the job description prepared for the Deputy Director of Parks and Recreation did not list landscape architecture as a qualification, casting doubt on defendants' purported desire for an individual with a landscape architecture degree.  (See Doc. 117, Ex. U, at 13; Doc. 66, Ex. B).

O'Malley also applied for the position of Deputy Director of Parks and Recreation, believing it to be the same position he previously held, simply re-titled. (Doc. 77 ¶ 15; Doc. 148 ¶ 15; Doc. 165, Ex. 10, at 24-25; Doc. 166, Ex. 10, at 51-52). O'Malley did not receive an interview.  Washo testified that O'Malley lost his job due to the reorganization of the Parks Department.  (Doc. 166, Ex. 10, at 52; Doc. 182, Ex. 28, at 113-117).  Washo also questioned O'Malley's diligence and effectiveness because, according to Washo, the parks were in disarray, and county facilities were not being utilized to their full potential.  (Id. at 114-115).  Washo, however, did not recall communicating to anyone in particular his concerns about park conditions and utilization.  (Id. at 116-117).

O'Malley disputes any inference of poor job performance. Randol similarly testified on behalf of the County that she could not recall anything negative about O'Malley's performance of his job.  (Doc. 172, Ex. 19, at 72).  O'Malley directs the court's attention to the Washo-O'Brien Hiring Chart which indicates that John

51

DeNuzio (Buildings and Grounds Manager) replaced O'Malley, with a salary increase of $7900. (Doc. 188, Ex. 50, at 5).  DeNunzio was a financial contributor to the Washo-O'Brien campaign. (Doc. 186, Ex. 32; Doc. 172, Ex. 19, at 73).  Finally, O'Malley contends that Washo told him there would be "big changes" if Washo was elected. (Doc. 185, Ex. 29I ¶ 31).  O'Malley believed this to mean major changes in personnel, and he viewed it as a clear threat to his employment stability.

Like DeAntona and O'Malley, Tonkin also applied for the position of Deputy Director of Parks and Recreation, believing it to be the equivalent of his position with the prior administration.  (Doc. 101 ¶ 22; Doc. 156 ¶ 22).  Defendants did not interview Tonkin.  (Doc. 169, Ex. 17, at 24).  Washo testified that it was "difficult discerning" Tonkin's precise job responsibilities given that there were three administrators in the Department (DeAntona, O'Malley and Tonkin).  (Doc. 182, Ex. 28, at 147-148).

Tonkin contends that his position was simply renamed and defendants hired two people, at higher salaries, to perform the tasks that he had handled for the County.  (Id. at 25, 32).[29]  He notes that nowhere in the job description for the position of Deputy Director of Parks and Recreation does it indicate that a landscaping architecture degree is desired.  (See Doc. 117, Ex. U at 13).  Hence,

---

[29] Defendants hired William Davis for the position of Deputy Director of Parks and Recreation.  Plaintiffs illogically argue that Davis was not hired to replace Tonkin and, therefore, Davis is incomparable to Tonkin.  (Doc. 156 ¶ 27).  Tonkin applied for the position of Deputy Director of Parks and Recreation and he believed to be his position re-titled. Thus, plaintiffs' argument is unavailing.

Tonkin argues that defendants' statements are simply post hac rationale for their improper motives.  The court notes Randol's testimony on behalf of the County that she could not recall anything negative about Tonkin's performance of his job.  (Doc. 172, Ex. 19, at 72).  Tonkin also emphasizes the Washo-O'Brien Hiring Chart as evidence of causation, which reflects that Ken Wuesling replaced him.  Defendants hired Wuesling for the position of Recreational Programs Manager, and Wuesling was a campaign contributor of Washo and O'Brien.  Moreover, Wuesling received a salary $8550 greater than Tonkin's.  (Doc. 188, Ex. 48; Doc. 188, Ex. 50, at 5).[30]

Taking the evidence in the light most favorable to plaintiffs, as the court must, fact issues preclude summary judgment with respect to DeAntona, O'Malley and Tonkin.  The hiring of campaign supporters, the dearth of evidence of performance problems, the discrepancy between posted positions and Washo and O'Brien's hiring rationale, the timing of the terminations, and the unemployment compensation form notations, all provide grounds for a reasonable  jury to conclude that defendants' stated reasons are not the true reasons for terminating plaintiffs DeAntona, O'Malley and Tonkin.

<u>*Harrison*</u>

Defendants restructured the Tax Claim Bureau, changed the Director position to a Deputy Director position and added responsibilities formerly

---

[30] The court notes that Wuesling made a political contribution of $130 on February 13, 2008, *after* the 2007 Commissioner election and the swearing-in of Commissioners Washo and O'Brien.  (Doc. 188, Ex. 48).

undertaken by the Director of Hotel Tax to the job of the newly-titled Deputy

Director of the Tax Claims Bureau.  (Doc. 172, Ex. 6, at 121-122).  Defendants

suggest that Harrison's job performance in collecting delinquent taxes was "fairly

weak."  (Id.)  According to defendants, Harrison could only explain procedures for

collecting delinquent taxes; he was unable to provide information consistent with

due diligence in reclaiming delinquent taxes.  (Id. at 122).  Defendants suggest

additional performance-based reasons for their decision, including Harrison's

purported failure to hold judicial sales.  They also suggest that Harrison authorized

the removal of individuals from the tax sale list based strictly upon connections

with the Cordaro-Munchak administration.  (Doc. 182, Ex. 28, at 128-135; Doc. 183,

Ex. 28, at 196; see also Doc. 175, Ex. 23, at 75-76).

     In response, Harrison notes that the suggested performance deficiencies

were never reported.  He alleges that defendants are merely conjuring up these

deficiencies to cover the true reason for his termination—his support for the

Republican Commissioners.  (Doc. 183, Ex. 28, at 196-197).  Harrison also points to a

conversation he had with Washo regarding his termination.  Harrison testified that,

when he confronted Washo about why Washo did not personally inform him of his

termination, Washo said "Tom, you were loyal to Bobby [Cordaro]" and "That's

politics."  (Doc. 164, Ex. 6, at 54-55).  Finally, Harrison notes that the individual

hired for the position of Deputy Director of Tax Claim contributed over $8000 to

Washo and O'Brien from 2007 through 2009, and was hired at a salary of over $3000

more than what Harrison made, thereby rendering any budgetary shortfall

explanation suspect.  (Doc. 187, Ex. 38; Doc. 188, Ex. 50).  Clear disputes of material fact prevent summary judgment with respect to Harrison.

<u>*Kovaleski*</u>

Restructuring undertaken by the Washo-O'Brien administration included reorganization of the County Public Defenders' Office, where Kovaleski held the position of Assistant Public Defender.  The restructuring process with respect to this department was materially different from the transition and restructuring of other County departments.[31]  Washo testified that he received complaints from the judiciary, namely Lackawanna County Judge Michael Barrasse ("Judge Barrasse"), that the Public Defenders' Office was in disarray.  (Doc. 180, Ex. 28, at 60-61).  Thus, Washo and O'Brien created the Courthouse Transition Team to provide recommendations on the organization and structure of the Public Defenders' Office.  The four-member Courthouse Transition Team consisted of Gerard Karam ("Karam"), a former public defender, Bob Munley, Chris Munley, and Jeff Nepa. (<u>No. 3:08-CV-0737</u>, Doc. 35 ¶ 22; Doc. 158 ¶ 22).

Karam interviewed Judge Barrasse about the Public Defenders' Office and took handwritten notes.  (Doc. 173, Ex. 20, at 120-122).  Judge Barrasse complained that attorneys were not fully accountable during business hours and lacked sufficient experience.  (Doc. 174, Ex. 20, at 125; <u>No. 3:08-CV-0737</u>, Doc. 36, Ex. C). Judge Barrasse purportedly informed Karam that Kovaleski was "in over his head."

---

[31]  My colleague, the Honorable William Caldwell details this reorganization in <u>Nolan v. Lackawanna County</u>, Civ. A. No. 2:09-CV-2567, Doc. 37.

(Doc. 174, Ex. 20, at 148-151).   Through personal observation Karam perceived

Kovaleski to be awkward in court.   Karam also received input from Judge Geroulo

about the Public Defenders' Office.   (Id.)

The Courthouse Transition team conferred on a few occasions and ultimately

provided their recommendations on the restructuring of the Public Defenders'

Office to defendants, however the team did not prepare a formal report.   (Doc. 173,

Ex. 20, at 34-40).   On January 4, 2008, defendants placed an advertisement for the

positions of First Assistant Public Defender, and full and part-time Assistant Public

Defenders, with an application deadline of January 14, 2008.   (Doc. 189, Ex. 53).   The

transition team reviewed applications and recommended candidates for the

advertised positions.   (See Doc. 173, Ex. 20, at 45-47, 54, 74-76).   Karam knew all but

one applicant personally and the one unknown applicant was known to and

recommended by other members of the transition team.   (Doc. 173, Ex. 20, at 65-68).

Karam met with Washo and O'Brien and Attorneys John O'Brien and Larry Moran

to provide the transition team's assessment of the candidates.   (No. 3:08-CV-0737,

Doc. 35 ¶ 43; Doc. 158 ¶ 43).   Washo and O'Brien adopted the recommendations of

the transition team.   (Doc. 180, Ex. 28, at 47-50).

At the time of the 2007 Commissioners' election, Kovaleski held a full-time

position with the County as an Assistant Public Defender.   (No. 3:08-CV-737, Doc. 35

¶ 1; Doc. 158 ¶ 1).   Kovaleski submitted a resume after receiving a memorandum

informing him that he would need to apply for a position in the Public Defenders'

Office under the Washo-O'Brien administration.  (Doc. 164, Ex. 7, at 28-29).

Kovaleski did not obtain a position.

Kovaleski submits that all the members of the Courthouse Transition team were Washo-O'Brien supporters in the 2007 election.  (See Doc. 175, Ex. 23, at 27-28; Doc. 187, Ex. 37; Doc. 188, Ex. 45; Doc. 173, Ex. 20, at 21).  Christina Coury, the person replacing Kovaleski according to the Washo-O'Brien Hiring Chart, worked for Larry Moran's law firm; Moran was a significant contributor to the Washo-O'Brien campaign.  (See Doc. 188, Ex. 50, at 9; Doc. 187, Ex. 44).  Kovaleski contends that the advertisements were shams, noting Karam's testimony that the transition team did not interview anyone  (Doc. 173, Ex. 20, at 66). Kovaleski also notes that defendants filled the Chief Public Defender position before the application deadline with an individual who was active in the Washo-O'Brien campaign.  (Doc. 177, Ex. 26, at 9-11).  Kovaleski also points to a January 13, 2008 email containing a version of the Washo-O'Brien Hiring Chart; this version of the chart identifies those individuals who were hired to fill the new part-time positions, again before the January 14, 2008 application deadline.  (Doc. 189, Ex. 36, at 9-10). Also significant are O'Brien's handwritten notes which list the names of the new hires next to the initials of Washo, O'Brien or Karam.  (Doc. 189, Ex. 52).  Kovaleski contends that the initials represent each new hire's sponsor, *i.e.* their connection to the Democratic Commissioners.  Indeed, Kovaleski provides evidence that the individuals who "sponsored" the new hires are all political supporters and contributors to the Washo-O'Brien campaign.  (Doc. 186, Exs. 30-31; Doc. 187, Ex.

57

37, 43, 44; Doc. 188, Ex. 45).  In light of this record evidence, the court concludes

that factual disputes clearly preclude summary judgment with respect to Kovaleski.

*McCawley*

As a result of the restructuring, defendants transferred McCawley's functions

as County Fleet Manager to the Purchasing Department and sought to hire a risk

manager "to gather all pieces of the insurance picture in the County."  (Doc. 172,

Ex. 19, at 77-79; see also Doc. 181, Ex. 28, at 82-83).  Defendants testified that

McCawley failed to perform his job duties in a satisfactory manner.  For example,

McCawley had no central repository for insurance information.  The County was

doubly insured in many cases. McCawley was unable to produce policies for use of

County vehicles and the maintenance records were "spotty at best."  (Doc. 172, Ex.

19, at 78-80).  Washo also testified that during his time as minority Commissioner,

McCawley lied to him about whether the County maintained coverage on any

vehicles that were not County-owned.  (Doc. 181, Ex. 28, at 84-85).  Despite these

alleged performance issues, defendants seek summary judgment principally on the

ground that the position of Fleet Manager was eliminated.  The functions of Fleet

Manager were transferred to the new Director of Purchasing, and all risk

management issues, from vehicles, to workers' compensation, are handled by a new

risk management officer.  (Doc. 181, Ex. 28, at 91-97).

McCawley counters that defendants simply renamed the Fleet Manager

position, now calling it the Deputy Director of Purchasing, and actually hired two

individuals to perform his former tasks as Fleet Manager.  (Doc. 141, at 75).  Indeed,

58

the County representative testified that the Deputy Director of Purchasing handles

fleet vehicles and another individual handles risk management.  (Doc. 172, Ex. 19, at

81).  McCawley submitted an application for the position of Deputy Director of

Insurance and Risk Managment.  McCawley received an interview, but claims that

the interview was a sham.  (Doc. 69 ¶¶ 18-19; Doc. 147 ¶¶ 18-19).  McCawley testified

that his interview lasted five minutes and defendants Washo and O'Brien only

asked him a couple general questions.  (Doc. 164, Ex. 8, at 60).  McCawley's

testimony about his interview, the timing of his termination, Munchak's testimony

that his termination was "politics," and the unemployment compensation form, in

the aggregate, raise a factual dispute as to the true basis for McCawley's

termination.  Summary judgment is unwarranted.

<u>Morano, Parise and Smallacombe</u>

Defendants eliminated the Department of Buildings and Grounds and

created the Department of Public Works in its stead.  (Doc. 172, Ex. 19, at 100-102).

This restructuring impacted the positions held by Morano, the Director of the

Department of Buildings and Grounds, Parise, the Assistant Director of Buildings

and Grounds, and Smallacombe, the Director of Roads and Bridges.  In the new

department, defendants created the position of Director of Public Works, which

they envisioned as having additional engineering responsibilities and oversight

functions.  (Id.).  They concluded that the functions of maintenance, buildings and

grounds should be a subsidiary to the Department of Public Works and thus

created the position of Deputy Director of Maintenance which would report to the

59

Director of Public Works.  (Id.)  Similarly, they created the position of Deputy

Director of Roads and Bridges under the Department of Public Works, which would

also report to the Director of the Department.  As a result of this major

restructuring, defendants claim that the positions formerly held by Morano, Parise

and Smallacombe were eliminated.  Also material to the court's analysis is Washo's

testimony that Morano had performance problems, namely that he was frequently

absent from work, (Doc. 181, Ex. 28 at 106), and that Parise was brought in as an

Assistant Director to keep an eye on Morano.  (Doc. 182, Ex. 28, at 117).

Morano applied for the position of Director of Public Works, but not the

position of Deputy Director of Maintenance.  (Doc. 73 ¶¶ 18, 26; Doc. 149 ¶¶ 18, 26).

Morano was unsuccessful in obtaining the position. He notes that the new Director

of Public Works has an engineering degree, and does initial assessments of

potential engineering projects, but performs no engineering work for the County.

(Doc. 172, Ex. 19, at 103-105).[32]  Morano argues that this fact contradicts defendants'

stated reason for restructuring and indicates defendants' ulterior motive.  In

addition, the Washo-O'Brien Hiring Chart indicates that Henry Peters, with the

title of Deputy Director of Maintenance, replaced Morano.  (Doc. 188, Ex. 50, at 4).

Peters was a financial contributor to Washo and O'Brien, though not until

September 2009.  (Doc. 188, Ex. 46).  In further proof of causation, Morano recalls a

---

[32]  Plaintiffs contend that John Eastman, the individual hired as Director of Public Works was a political supporter of Washo and O'Brien.  According to the record, Eastman contributed $250 to the Washo-O'Brien campaign on September 28, 2009.  (Doc. 186, Ex. 34).

brief conversation with Washo during which Washo proclaimed, "You are killing me with these signs in Olyphant." (Doc. 165, Ex. 9, at 52). Morano believes this conversation is indicative of defendants' plan to retaliate against Republican supporters, him in particular.

Regarding Parise, defendants testified that the prior administration hired Parise to watch Morano and, therefore, his position was redundant. Washo also observed that Parise appeared to have precious few job responsibilities. (Doc. 182, Ex. 28, at 117-119). In light of these facts, defendants assert that Parise's position was eliminated and that he lacked the necessary qualifications and experience for the newly created positions in the Department of Public Works.

Parise counters that defendants' assertions are belied by the Washo-O'Brien Hiring Chart, which reflects that his position was not eliminated; rather, he was replaced by John Eastman who was hired as Director of Public Works at a much higher salary. (See Doc. 188, Ex. 50, at 4). Parise also claims that Washo warned him that he was supporting the wrong team, meaning the Republican Commissioners. (Doc. 185, Ex. 29J ¶ 31).

Smallacombe, like Morano, applied for the position of Director of Public Works. He received an interview. (Doc. 93 ¶¶ 19-20; Doc. 154 ¶¶ 19-20).[33] Washo testified that Smallacombe "had a bad attitude" and was unpleasant to others.

---

[33] Smallacombe did not apply for the position of Deputy Director of Roads and Bridges, and could not recall seeing an advertisement for the position. (Doc. 93 ¶¶ 22-23; Doc. 154 ¶¶ 22-23).

(Doc. 182, Ex. 28, at 139-140).[34]  Smallacombe avers that his interview was suspect and that Washo and O'Brien only sought to obtain information from him about the functions of the Department of Public Works.  (Doc. 168, Ex. 15, at 41).  When he was terminated in April of 2008 by Eastman, the new Director of Public Works, Eastman purportedly stated "we do not have a reason [for your termination]. You're doing a great job.  We can't dispute the work you're doing.  We want to put our own guy in."  (Id. at 48).

Viewed in the light most favorable to Morano, Parise, and Smallacombe, there is sufficient evidence from which a reasonable jury could find plaintiffs' political affiliation to be a substantial or motivating factor in their terminations. Despite certain claims of performance problems, the relevant personnel files do not reflect any such problems.  Individuals hired in the Department of Public Works received higher salaries than plaintiffs, which casts doubt on defendants' budgetary explanation for restructuring and job elimination.  There is evidence that defendants hired campaign supporters. In addition, certain statements of defendants could be interpreted to reflect discriminatory intent.  This evidence, combined with the timing of the terminations, the unemployment forms, the

---

[34]  Smallacombe contends that Washo's testimony "is clearly fabricated, based on the vague nature of the testimony and cross-examination."  (Doc. 154 ¶ 27).  This argument is of no moment.  The court cannot assess witness credibility on summary judgment.  See Boyle, 139 F.3d at 393 (stating that weighing evidence and credibility determinations are tasks left for the fact-finder).

Washo-O'Brien Hiring Chart, and Munchak's testimony that the terminations were political, is sufficient to compel submission of the issues to a jury.

### Propersi

Defendants contend that they eliminated Propersi's position as Director of Hotel Tax and reassigned his duties to the Deputy Director of Tax Claims. (Doc. 172, Ex. 19, at 118). Based upon information gathered during their transition, defendants assert that Propersi's job duties could be completed with a commitment of only five hours of work per month. (Id.) Moreover, O'Brien testified that his transition team indicated that Propersi was not actually collecting the taxes, a duty which devolved to a part-time employee on Propersi's staff. (Doc. 175, Ex. 23 at 79; Doc. 182, Ex. 28, at 148-149). Propersi responds that someone must be performing the job of collecting the hotel tax, therefore his position was not eliminated. (Doc. 167, Ex. 12, at 43-44). He also notes that the transition team report does not indicate, as defendants contend, that his position required only five hours of work per month. (Doc. 151 ¶ 26). Given the number of terminations, the timing of the terminations, the unemployment compensation forms, Munchak's testimony and the transition team reports, the court concludes that summary judgment on Propersi's claim is unwarranted.

### Rinaldi

Defendants cite the same restructuring argument with respect to the termination of Rinaldi, the Director of Purchasing. Defendants reorganized the

Purchasing Department, eliminated Rinaldi's Director position and created the position of Deputy Director of Purchasing.

Rinaldi applied for the position of Deputy Director of Purchasing and received an interview. (Doc. 85 ¶ 15; Doc. 152 ¶ 15). Rinaldi was interviewed, but he contends that the interview was a sham which did not even touch upon his department's functions. (Doc. 167, Ex. 152, at 46-48). Rinaldi stresses that the individual hired to replace him, James McLaine, supported the Washo-O'Brien campaign. (Doc. 188, Ex. 50, at 2; Doc. 187, Ex. 42).[35] This evidence, coupled with the lack of clear delineation between the two positions at issue in Rinaldi's case, creates a dispute of fact. Accordingly, summary judgment must be denied.

### *Romanini*

Romanini held the position of Grant Writer in the Department of Strategic Planning. (Doc. 89 ¶ 1; Doc. 153 ¶ 1). Washo testified that as part of the reorganization, the entire Department of Strategic Planning was eliminated. (Doc. 182, Ex. 28, at 137; Doc. 176, Ex. 23, at 119). Defendants claim that they advertised for a grant writer position, but they were unable to fill the position and Lackawanna County employs no grant writers. (Doc. 182, Ex. 28, at 137).

Romanini counters that defendants did not eliminate his position. According to Romanini, "grants are being written" and "somebody is writing the grants," and cites to a newspaper article about a grant the County obtained. (Doc. 168, Ex. 14, at

---

[35] McLaine's political contributions occurred post-2007 election, in February 2008 and September 2009. (Doc. 187, Ex. 42).

51-52).  According to the Washo-O'Brien Hiring Chart, defendants replaced

Romanini with Wayne Hiller, who has the title of Economic Development Cabinet

Manager, at a salary $17,250 higher than Romanini's.  (Doc. 188, Ex. 50, at 4).[36]

Romanini points out that Hiller was a volunteer for the Washo-O'Brien campaign,

and later made political contributions.[37]  (Doc. 172, Ex. 19, at 148; Doc. 187, Ex. 36).

Moreover, despite defendants' contention that they eliminated the entire

department (a three-person department), only Romanini was terminated, whereas

defendants retained Harry Linday the department director and retained the other

department staff member who had union rights.  (Doc. 182, Ex. 28, at 137-138).  In

light of these numerous factual disputes, summary judgment is unwarranted.

### *Spano*

Spano worked for the County as Assistant Director in the Department of

Voter Education.  (Doc. 97 ¶ 11; Doc. 155 ¶ 11).  At the time of his hire in 2005, the

County had two offices dealing with voting matters—Voter Registration and Voter

Education—and there was obvious overlap between the offices.  (Doc. 168, Ex. 16, at

19-20).  When Washo and O'Brien took office, they restructured these departments,

establishing the Bureau of Elections and reducing the total number of employees.

(Doc. 172, Ex. 19, at 112).  One of Spano's duties was to educate the public on the

---

[36]  O'Brien testified that the title reflected in the Hiring Chart is inaccurate and that Hiller is an experienced county employee who works in the arts and cultural development area.  (Doc. 176, Ex. 23, at 120-121).

[37]  See note 23 supra. Hiller's financial contributions occurred post-election.

65

use of new electronic voting machines. Ultimately, the machines were discontinued as the result of certification problems. (Doc. 97 ¶¶ 14-15, 23-24; Doc. 155 ¶¶ 14-15, 23-24). Consequently, defendants argue that they eliminated Spano's position and transferred the remaining functions of his job to the Director of Bureau of Elections. (See Doc. 172, Ex. 19, at 112-113; Doc. 176, Ex. 23, at 205-207). Washo also testified that individuals employed in the Voter Education Department were required to be apolitical and that the Commissioners "didn't think that Mr. Spano could fill that bill" because Spano frequently ran for elected positions. (Doc. 182, Ex. 28, at 142-144). Finally, defendants note that they retained another individual in the voter registration office who was a supporter of Cordaro and Munchak, and therefore Spano cannot establish that his termination had anything to do with his political affiliation. (Doc. 168, Ex. 16, at 50).

Spano applied for the position of Deputy Director of Voter Education in the Washo-O'Brien administration, and received an interview, but Spano argues that his interview was bogus. (Doc. 97 ¶¶ 31-33; Doc. 155 ¶¶ 31-33). Spano claims that he was asked a single question about voter education and that the rest of the interview (approximately 8-10 questions) concerned the issue of political activity. (Doc. 168, Ex. 16, at 64-66). According to the Washo-O'Brien Hiring Chart, Spanos' position is now called Voter Outreach Specialist. Although no one has been hired to fill the position, the chart indicates that the position has been funded (not eliminated). (Doc. 188, Ex. 50, at 5). On this record, factual disputes preclude summary judgment.

\*\*\*

Considering the evidence in the light most favorable to plaintiffs there are genuine issues of material fact as to whether their political affiliation was a substantial or motivating factor in their termination. There is also sufficient evidence from a which a jury could find that plaintiffs' terminations were the result of legitimate reorganization and restructuring of the County and the removal of a perceived political patronage system. Indeed,

> [a] *Branti-Elrod* claim cannot rest on the implementation of a policy to eliminate one or more patronage jobs. Otherwise, *Branti-Elrod* would institutionalize patronage jobs, which often are not the most critical or arduous. Prudent city managers would be forced to tolerate wasteful employment rather than incur the sometimes greater expense of litigation. And the political debate that the First Amendment fosters, which in local government is largely concerned with decisions about what services to supply and how many people are required to do them, would be rendered in part futile. Unless there is evidence of political retribution other than a design to curb patronage, there is no case for the jury. Even where such evidence exists, and is credited, there is no claim if the job would have been eliminated in any event to cut the budget-even though the ousted jobholder will often be on the losing side politically, and regardless of any incidental satisfaction the unemployment of an adversary may afford those in power.

Vezzetti v. Pellegrini, 22 F.3d 483, 488 (2d Cir. 1994); c.f. McGroarty, 311 Fed. App'x at 555 (affirming district court's grant of summary judgment in § 1983 First Amendment political affiliation case and stating that "[w]hen a mayor creates a new department and names his brother to a leadership role in it . . . , the next mayor should be able to fire the brother. The former mayor created the impression . . . of nepotism. The new mayor needs to be able to distance himself from that image.").

The elimination of patronage jobs does not give rise to a political patronage discrimination claim, but, in the case *sub judice*, there are clearly disputed issues of material fact as to whether defendants actually sought to reduce patronage positions or merely used the concept as a subterfuge to hire their own political supporters.

There is sufficient evidence from which a jury could find that plaintiffs' political patronage was the motivating factor for their separation from County employment. Washo and O'Brien terminated all the plaintiffs on the first day or shortly after the first day they took office. All of the plaintiffs supported the Republican Commissioners in the 2007 election. A number of the individuals hired to replace plaintiffs made political contributions to Washo and O'Brien during or after the 2007 election. Others knew one of the Commissioners or an influential person in the Washo-O'Brien administration. (See Doc. 186, Exs. 30-34; Doc. 187, Exs. 35-44; Doc. 188, Exs. 45-48). County unemployment forms listed the reason for plaintiffs' termination as "change of administration," and minority Commissioner testified that plaintiffs' terminations were political. (Doc. 174, Ex. 22, at 21-38; Doc.

189, Ex. 51).[38]  On this record, summary judgment is unwarranted.  Plaintiffs have

established a prima facie case of political patronage discrimination.

### 4.    **Same Decision Defense**

In the alternative, defendants claim that they are entitled to summary

judgment because they would have made the same employment decision regardless

of plaintiffs' protected activity.  Galli, 490 F.3d at 271. This argument is, at least in

part, a rehashing of defendants' argument with respect to the third prong of the

political patronage claim.  Defendants assert that they would have undertaken the

same reorganization, restructuring of departments and elimination of positions due

to the budget shortfall and their campaign promises.  In addition, defendants

contend that the individuals hired to replace plaintiffs were more qualified than the

plaintiffs.[39]

---

[38]  Plaintiffs also reference "chatter" in the community, "threats" and statements from purported Democratic supporters that their jobs were in jeopardy. (See generally, Doc. 159 ¶¶ 99-113).  For example, Smallacombe testified that numerous people told him that he would be fired: "People that were involved in the democratic party that knew me.  One was a police officer who was a democrat committee man.  One was a council person in another town.  Several other people. I don't remember who, but I know that there was quite a few people that said I would be out of work shortly."  (Doc. 168, Ex. 15, at 48-49).  Spano testified that his wife overheard a conversation between two alleged Washo-O'Brien supporters that they were targeting Spano for replacement.  (Doc. 168, Ex. 16, at 46-47). These statements are clearly hearsay and cannot be considered by the court on summary judgment.  See FED. R. CIV. P. 56(c)(2).

[39]  The court declines to compare the qualifications of the new hires to the terminated plaintiffs.  The disputes as to causation are sufficient in themselves to deny summary judgment regardless of any such comparison.

The court finds that the factual disputes surrounding the substantial or

motivating factor element of the political patronage claim similarly prevent

summary judgment on grounds of the same decision defense asserted by

defendants.  See Kalinoski v. Lackawanna County, Civ. A. No. 3:10-CV-0314, 2011

WL 4048531, at *10 (M.D. Pa. Sept. 12, 2011) (citing Lint v. County of Fayette, Civ. A.

No. 10-321, 2011 WL 2650014, at *8-9 (W.D. Pa. July 5, 2011)).  Defendants have

provided justification for their employment actions but plaintiffs have put forth

evidence from which a jury could conclude that their termination violated their

First Amendment rights.  Given the factual disputes, which a jury must resolve,

summary judgment is inappropriate.

### D.   Galella Issues

Special issues arise with respect to the claims asserted by Galella, who was a

member of a union at the time of his termination.[40]  Galella worked in the County

---

[40]  It is unclear whether Galella retained his rights under the union contract,
as Galella admits that he submitted a written request to the union to withdraw, and
he stopped paying union dues in 2004.  (Doc. 162, Ex. 5, at 20-22; see also Doc. 106,
Ex. D, at 2-3).  The arbitrator opined that

> there are credible arguments to be made against the Union's assertion
> that the grievant's position is covered by the Union.  One is that the
> grievant, the only incumbent in the GIS Coordinator position,
> withdrew from the Union before the effective date of the Agreement.
> Another is that his wage increases bore no relation to his entitlements
> thereto under the Agreement.  Yet another is that his administrative
> duties may, at some point, have been quasi-managerial in nature.  As
> the County points out, the Union may be advocating that the grievant
> be afforded the advantage of representation without the remunerative
> limits of the Agreement.  However, if this specific argument is to be
> addressed at some point, the parties, in my view, should do it outside

Assessor's Office and held the position of GIS Coordinator, a union position in the bargaining unit. (Doc. 105 ¶¶ 1, 6, 17; Doc. 145 ¶¶ 1, 6, 17). As discussed above, Washo and O'Brien reorganized the department and eliminated the GIS Coordinator position because the County lacked the proper technology to handle the type of GIS coordination needed for the reassessment. (Doc. 105 ¶ 41; Doc. 117, Ex. L, at 114-117).

Subsequent to Galella's receipt of the January 7, 2008 letter informing him that his position had been eliminated, Galella filed a union grievance claiming that his termination was not in accordance with the union Collective Bargaining Agreement ("CBA"). (Doc. 105 ¶¶ 47, 48; Doc. 145 ¶¶ 47, 48). At the grievance hearing the Union raised the issue of political retribution, but the arbitrator concluded that the issue was waived because it was not raised prior to the hearing. (See Doc. 106, Ex. D, at 8-9). Ultimately, the arbitrator found that the County complied with the CBA. (Doc. 105 ¶ 55; Doc. 145 ¶ 55).

In 2008, Galella applied for Social Security disability benefits, and the Social Security Administration found him disabled as of January 7, 2008, the date of his termination from the County. (Doc. 105 ¶¶ 56, 57; Doc. 145 ¶¶ 56, 57).

---

the confines of a grievance arbitration.

For purposes of this case alone, therefore, I will proceed as if the grievant is a covered employee, thereby giving me authority to reach the merits of the dispute.

(Doc. 106, Ex. D, at 6-7). The court need not resolve the dispute, because *assuming arguendo* that Galella was covered by the Union, the court finds that Galella has not asserted a viable due process claim.

Given the union grievance proceedings and arbitration, defendants contend that Galella is collaterally estopped from relitigating his layoff in the instant action. (Doc. 107, at 19). Defendants assert that Galella had the full panoply of due process rights stemming from the CBA. (Id. at 20-22). Defendants also assert that Galella is judicially estopped from proceeding with this action because the award of Social Security disability benefits definitely established that he was unable to perform his duties as a GIS Coordinator. (Id. at 22-23).

Plaintiffs counter that Galella is not relitigating any claim because the matter before the court here—that he was terminated on the basis of his political affiliation—was not addressed by the arbitrator, and he was not a party in that action because the union argued on his behalf. (Doc. 141, at 94-96). Plaintiffs argue that defendants violated Galella's due process rights by terminating him because, as a union member subject to the CBA, he had a property interest in his position and could not be terminated without just cause. (Id. at 96-98). Finally, plaintiffs claim that Galella is not judicially estopped from proceeding in this matter due to the Social Security Administration determination of disability because Galella testified that his disability would not prevent him from performing the functions of his job as GIS Coordinator. (Id. at 98-101).

## 1.    <u>No Relitigation Bar</u>

Collateral estoppel does not preclude Galella's claim of political patronage discrimination in the instant action. The doctrine of collateral estoppel applies when: "(1) the identical issue was previously adjudicated; (2) the issue was actually

litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 247-48 (3d Cir. 2010) (citations and quotations omitted). If any of these elements are not satisfied, collateral estoppel does not apply. Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 126 F.3d 461, 475 (3d Cir. 1997).

The Supreme Court has squarely addressed the preclusive effect of an arbitration decision on a later § 1983 lawsuit. In McDonald v. City of West Branch, Mich., 466 U.S. 284 (1984), a terminated police officer filed a grievance pursuant to his union's collective-bargaining agreement alleging there was no proper cause for his discharge. McDonald, 466 U.S. at 285-86. The arbitrator ruled against McDonald, and he did not appeal the arbitration decision. Id. at 286. Thereafter, McDonald filed a § 1983 action alleging violations of his First Amendment speech, association and petitioning rights. Id. The court of appeals held that the arbitration process had not been abused and therefore McDonald's claims were barred by res judicata and collateral estoppel. Id. at 287. The Supreme Court reversed, holding that "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." Id. at 292. The Supreme Court reaffirmed this holding, which is supported by the "difference between contractual rights under a collective-bargaining agreement and individual statutory rights, the potential disparity in interests between a union and an

73

employee, and the limited authority and power of labor arbitrators."   Gilmer v.

Intersate/Johnson Lane Corp., 500 U.S. 20, 35 (1991).   Thus, Galella is not

collaterally estopped from bringing this § 1983 suit.

### 2.   **Due Process**

With respect to the due process issue, "[e]mployment contracts that contain a

'just cause' provision create a property interest in continued employment," thereby

implicating due process concerns.   Dee v. Borough of Dunmore, 549 F.3d 225, 231

(3d Cir. 2008) (quoting Wilson v. MVM, Inc., 475 F.3d 166, 177 (3d Cir. 2007)).   In the

instant matter, however, Galella has not pointed to any CBA provision suggesting

he could not be terminated, or his position eliminated without just cause; rather it

appears that the CBA gave him bumping rights only.   (See Doc. 106, Ex. D, at 9).

The existence of the CBA is not, in itself, sufficient to confer a due process right

upon Galella.   See Dee, 549 F.3d at 231.   Based upon the summary judgment record,

the court finds that Galella's due process rights have not been violated.

### 3.   **Judicial Estoppel**

Judicial estoppel is an equitable doctrine that precludes a party from taking

an inconsistent position from that which he has taken in a prior legal proceeding on

the same matter.   See Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 272 (3d Cir.

2012); Scarano v. Central R. Co., 203 F.2d 510, 512-13 (3d Cir. 1953).   In Cleveland v.

Policy Managment Systems Corp., 526 U.S. 795 (1999), the Supreme Court held that

an individual's receipt of Social Security disability benefits does not automatically

estop the recipient from pursuing an American's with Disabilities Act claim, but as

long as the employee can explain why the receipt of benefits is consistent with the claim that he or she could perform the essential functions of the job under the ADA. Id. at 797-98.  The inconsistencies must be explained "in a manner sufficient 'to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless' perform the job."  Macfarlan, 675 F.3d at 272 (quoting Cleveland, 526 U.S. at 807).

In the instant matter, Galella explicitly testified he would be able to perform the duties of the GIS Coordinator.  (Doc. 163, Ex. 5, at 78).  Importantly, Galella observed that if he were able to locate another job similar to his GIS Coordinator position, his disability benefits would cease.  (Id. at 60).  In the context of the pending Rule 56 motion, the court finds that Galella's § 1983 claims are not precluded by his receipt of Social Security benefits, and that he is not judicially estopped from proceeding in this matter.

### E.   <u>Legislative Immunity</u>

Defendants Washo and O'Brien also move for summary judgment against Kovaleski, Romanini and Propersi on grounds of absolute legislative immunity.[41]

---

[41]  Washo and O'Brien initially assert legislative immunity only as it pertains to the termination of Kovaleski, Romanini and Propersi.  (See No. 3:08-CV-0737, Doc. 37, at 17-18; No. 3:08-CV-1926, Doc. 89, at 11-12, Doc. 111, at 14-15).  In certain reply briefs, Washo and O'Brien assert that they are only entitled to legislative immunity against Bradley, Galella, O'Malley, Parise, Spano, and Tonkin.  (See Doc. 198, at 4; Doc. 202, at 8; Doc. 203, at 4-5; Doc. 207, at 3-4; Doc. 208, at 4; No. 3:09-CV-0737, Doc. 57, at 5).  A reply brief is not the appropriate forum in which to raise new issues and the court need not address issues raised for the first time therein.  See United States v. Martin, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006); Dreyer v. Sheaffer, No. 3:08-CV-1132, 2009 WL 917829, at *3 (M.D. Pa. Apr. 2, 2009).  The court

Legislative immunity protects local legislators from suit for "all actions taken 'in the sphere of legitimate legislative activity.'" Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951)).  The motive or intent of the official performing the act is irrelevant; the court's analysis must focus on the nature of the action taken.  Id.  An act must be both substantively and procedurally legislative in nature to entitle an official to absolute immunity.  In re Montgomery County, 215 F.3d 367, 376 (3d Cir. 2000).  "An act is substantively legislative if it involves 'policy-making of a general purpose' or 'line-drawing.'  It is procedurally legislative if it is undertaken 'by means of established legislative procedures.'"  Id. (internal citations omitted).  Administrative or executive acts are not entitled to immunity.  Carver v. Foerster, 102 F.3d 96, 100 (3d Cir. 1996).

Defendants' argument for legislative immunity is the same for all plaintiffs: each plaintiff's position was eliminated.  The elimination of those positions was a budgetary decision, and that budgetary decision was ratified through a formal vote when the Commissioners approved the 2008 County budget at the January 30, 2008 Lackawanna County Board of Commissioners Meeting.  (See Doc. 91, at 11-12; Doc. 111, at 14-15; No 3:08-CV-737, Doc. 37, at 18; see also Doc. 211, Ex. WW).

In response, plaintiffs assert that Washo and O'Brien's acts were neither procedurally nor substantively legislative.  (Doc. 141, at 91).  They contend that the

---

notes that defendants' master reply brief asserts legislative immunity only with respect to Kovaleski, Romanini and Propersi.  (Doc. 209, at 18-20).  Hence, the court will consider the legislative immunity defense only as asserted against Kovaleski, Romanini and Propersi.

three Commissioners did not meet, there was no agenda, and no vote of any sort. (Id.)  Plaintiffs argue that their terminations involved no policy making decision and no line-drawing, thus they were not substantively legislative.  (Id. at 92).  To the contrary, on the first day in office, Washo and O'Brien "had a staffer terminate the employees" thereby rendering the acts administrative in nature.  (Id. at 93).

Two other courts in this District have been presented with the issue of legislative immunity for Washo and O'Brien for their post-election conduct.  Both courts have found Washo and O'Brien's conduct in reorganizing departments and eliminating positions to be substantively legislative.  Only one has found their conduct procedurally legislative.

In Nolan v. Lackawanna County, Civ. A. No. 3:09-CV-2567 (M.D. Pa.), a political patronage discrimination case filed by Thomas Nolan, an employee in the Public Defenders' Office of Lackawanna County, Judge Caldwell held that Washo and O'Brien were entitled to legislative immunity for their actions of preparing and approving the Lackawanna County budget in which positions were eliminated. Nolan, No. 3:09-CV-2567, Doc. 37, at 4 (M.D. Pa. Aug. 25, 2011).  In Kalinoski v. Lackawanna County, No. 3:10-CV-314, Judge Caputo determined that Kalinoski's termination from the Public Defender's Office was substantively legislative because it was a discretionary policy-making decision and part of a larger plan of reorganization.  Kalinoski, 2011 WL 4048531, at * 5 (Sept. 12, 2011).  While Judge Caldwell found the approval of the budget procedurally legislative in Nolan, Judge

77

Caputo concluded that there was a genuine issue of material fact as to whether Kalinoski's termination was procedurally legislative.  Id.

In Kalinoski, defendants argued that their acts were procedurally legislative because they established a transition team to provide recommendations and then accepted those recommendations.  Id.  Noting that "reorganization of departments and the appointment of employees are both within the legislative powers of Lackawanna County Commisioners," the Kalinoski court found the record devoid of evidence regarding the statutory procedure for a reorganization and thus could not conclude whether formation of a transition team was sufficient to make the reorganization of the department procedurally legislative.  Id.[42]

To determine whether Washo and O'Brien are entitled to legislative immunity, the court must look at their actions "stripped of all considerations of intent and motive."  Bogan, 523 U.S. at 55.  Of note, the Supreme Court has specifically held that recommending and voting on a budget "reflect[s] a discretionary, policymaking decision implicating the budgetary priorities of the [County]."  Bogan, 523 U.S. at 55-56.

Under the Lackawanna County Home Rule Charter, "[a]ll legislative powers which may be exercised by the County . . . shall be vested in the Board of Commissioners" including the powers:

---

[42]  The defendants have appealed Judge Caputo's denial of legislative immunity to the Third Circuit.  See Kalinoski, No. 3:10-CV-314, Doc. 69.  The appeal is pending.  Kalinoski v. Lackawanna County, No. 11-4017 (3d Cir.).

(b) to make appropriations, incur indebtedness, and adopt an annual and capital budget

. . .

(g) in aid of its legislative powers and functions, to make, or cause to be made, as a body or though a committee thereof, such studies, audits, inquiries, and investigations relating to the affairs of the County and its government and to the conduct of any agency, officer, or employe, and in connection therewith to obtain professional and technical advice . . .

. . .

(j) to appoint or confirm, as the case may be, officers and employes as provided by this Charter, by ordinance, or by state law

. . .

(l) to establish, abolish or reorganize departments and/or programs to promote efficiency and economy;

See 335 Pa. Code § 1.3-302(b), (g), (j), (l).  Additionally, the Commissioners are to draft a budget for submission, which contains specific information dictated by the Charter.  See 335 Pa. Code §§ 1.12-1202, 1.12-1204.

Like Nolan and Kalinoski, the court finds that the reorganization and restructuring of Lackawanna County departments and the preparing of a budget—which by Pennsylvania Code are considered legislative powers vested in the Commissioners—were substantively legislative acts.  They involved policy making and line-drawing and affected virtually all areas of government and numerous individuals.  Cf. In re Montgomery County, 215 F.3d 367, 376-77 (3d Cir. 2000) (appellants not entitled to absolute immunity for decision to terminate employee despite vote of salary board to terminate employee because the termination "did not involve a matter of general policy, applicable to a variety of circumstances, nor to a range of County employees," and "[f]iring a particular employee is a personnel decision that does not involve general policy making.  Appellants' firing of

[employee] did not reach beyond 'the particular occupant of the office'" (citations omitted)). Stripped of intent and motive, the acts of reorganization and restructuring and preparing a budget were substantively legislative.

The court also finds the acts procedurally legislative. Washo and O'Brien prepared a budget as required by the Charter, and the budget was voted on and approved at a Board of Commissioners meeting. (See Doc. 211, Ex. WW). Washo and O'Brien are thus entitled to legislative immunity against Kovaleski, Romanini and Prosperi, whose claims will proceed only against Lackawanna County.[43]

## F.   State Law Wrongful Termination Claim[44]

Plaintiffs assert a wrongful termination claim under state law stemming from the alleged violation of their First Amendment speech and association rights. In Pennsylvania, there is no common law cause of action for discharge of an at will employee, and at will employees may be discharged "with or without cause, at pleasure, unless restrained by some contract." Dewees v. Haste, 620 F. Supp. 2d 625, 639 (M.D. Pa. 2009) (citations and quotations omitted). The Pennsylvania Supreme Court has recognized a narrow exception to the general at-will employment doctrine, permitting a common law cause of action when the discharge violates clearly mandated public policy. Id. (citing Clay v. Advanced Computer

---

[43]  The doctrine of legislative immunity does not apply to municipalities, therefore Lackawanna County does not and cannot move for summary judgment on this ground. See Carver v. Foerster, 102 F.3d 96, 102-05 (3d Cir. 1996).

[44]  The court exercises supplemental jurisdiction over the state law claims. See 18 U.S.C. § 1367.

Applications, Inc., 559 A.2d 917, 918-19 (1989)).  "The right of a court to declare what

is or is not in accord with public policy exists 'only when a given policy is so

obviously for or against public health, safety, morals, or welfare that there is a

virtual unanimity of opinion in regard to it.'"  Weaver v. Harpster, 975 A.2d 555, 563

(Pa. 2009).[45]

Public policy is determined by examining the Pennsylvania Constitution,

Pennsylvania statutes and Pennsylvania court decisions.  Id.  Both federal and state

courts in Pennsylvania have refused to apply the doctrine broadly and "have been

disinclined to find a cause of action based solely upon constitutional protections."

Dewees, 620 F. Supp. 2d at 639-40; Nolan v. Lackawanna County, Civ. No. 3:CV-09-

2567, 2011 U.S. Dist. LEXIS 95378, at *10-11 (M.D. Pa. Aug. 25, 2011); Martin v.

Capital Cities Media, Inc., 511 A.2d 830 (Pa. Super. Ct. 1986); Veno v. Meredith, 515

A.2d 571, 581 (Pa. Super. Ct. 1986); see also McLaughlin v. Gastrointestinal

Specialists, Inc., 750 A.2d 283, 317 (Pa. 2000) (holding that "in order to set forth a

claim for wrongful discharge a Plaintiff must do more than show a possible

violation of a federal statute that implicates her own personal interest.  The Plaintiff

in some way must allege that some *public policy* of *this* Commonwealth is

implicated, undermined, or violated because of the employer's termination of the

---

[45]  Pennsylvania courts have recognized a cause of action for wrongful
discharge in cases where an employee is terminated for filing a worker's
compensation claim, or unemployment compensation claim, see Shick v. Shirey,
716 A.2d 1231 (Pa. 1998), Highhouse v. Avery Transportation, 660 A.2d 1374 (Pa.
Super. Ct. 1995), and where an employee was discharged for serving on a jury, see
Reuther v. Fowler & Williams, Inc., 386 A.2d 119 (Pa. Super. Ct. 1978).

employee"); Goodwin v. Moyer, 549 F. Supp. 2d 621, 636 (M.D. Pa. 2006) (stating

that "[o]n the limited occasions it has been recognized, the exception was most

often applied where the employee complied with or violated the law against the

employer's wishes").

The court finds that plaintiffs have not established a state law claim for

wrongful discharge.  The public policy exception to the at-will employment doctrine

under Pennsylvania law is quite narrow and, as stated above, courts have been

"disinclined to find a cause of action based solely upon constitutional protections."

Dewees, 620 F. Supp. 2d at 639-40.[46]  In their complaints, plaintiffs allege violations

of their federal constitutional rights to speech and association.  Plaintiffs, however,

have a recognized cause of action for the purported violations of their federal

constitutional rights: a § 1983 action.  There is no need to expand the very narrow

public policy exception to the at-will employment doctrine to provide plaintiffs

another avenue of relief.  The Third Circuit has recognized that the "only

Pennsylvania cases applying the public policy exception have done so where no

statutory remedies were available."  Bruffet v. Warner Communications Inc., 692

---

[46]  In Dewees v. Haste, a case in this district before the Honorable Yvette
Kane, a former deputy warden brought suit against the county, the prison warden
and various other members of the county and prison alleging First Amendment
retaliation and a state law wrongful discharge claim.  620 F. Supp. 2d 625 (M.D. Pa.
2009).  Deewees is not entirely on point because Chief Judge Kane granted
judgment for defendants on the wrongful discharge claim on other grounds.  Id. at
639-642.

F.2d 910, 919 (3d Cir. 1982).  Therefore, the court will grant the defendants' motion for summary judgment on the state law wrongful discharge claim.

### E.    **Punitive Damages**

Finally, defendants Washo and O'Brien contend that they are entitled to summary judgment on plaintiffs' punitive damages claim.  Punitive damages are available against individual defendants in § 1983 actions only when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Central Dauphin Sch. Dist., 419 F. Supp. 2d 639, 649 (M.D. Pa. 2005) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  A defendant's knowledge that he is acting in violation of federal law may suffice to establish reckless indifference in § 1983 civil rights cases.  See Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000).  Given the myriad of factual issues with respect to plaintiffs' political patronage allegations, summary judgment on the claim for punitive damages is premature.

## IV.   **Conclusion**

For the above-stated reasons, the court will grant the motions in part and deny them in part.  An appropriate order follows.


 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      August 31, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THOMAS J. BELL, ANTHONY** : | **CIVIL ACTION NO. 3:08-CV-1926** |
| **BERNARDI, JOSEPH DeANTONA,** : | |
| **JOSEPH McCAWLEY, JAYME** : | |
| **MORANO, PATRICK O'MALLEY,** : | |
| **NICHOLAS PARISE, DOMINICK** : | |
| **RINALDI, DOMINIC ROMANINI,** : | |
| **BRUCE SMALLACOMBE, CHARLES** : | |
| **SPANO, WILLIAM TONKIN, JR.,** : | |
| **THOMAS GALELLA III, GARY** ; | |
| **PROPERSI, and THOMAS** : | |
| **HARRISON,** : | |
| : | |
| **Plaintiffs** : | |
| : | |
| **v.** : | |
| : | |
| **LACKAWANNA COUNTY, COREY** : | |
| **O'BRIEN and MICHAEL WASHO** : | |
| : | |
| **Defendants** : | |

-----------------------------------------------------------------------------

| | |
|---|---|
| **KENNETH KOVALESKI and** : | **CIVIL ACTION NO. 3:08-CV-737** |
| **THOMAS BRADLEY,** : | |
| : | |
| **Plaintiffs** : | |
| : | |
| **v.** : | |
| : | |
| **LACKAWANNA COUNTY, COREY** : | |
| **O'BRIEN and MICHAEL WASHO** : | |
| : | |
| **Defendants** : | |

## ORDER

AND NOW, this 31st day of August, 2012, upon consideration of the motions

for summary judgment (No. 3:08-CV-1926, Docs. 56, 60, 64, 68, 72, 76, 80, 84, 88, 92,

96, 100, 104, 108, 112; No. 3:08-CV-0737, Docs. 34, 38) filed by defendants, and upon

further consideration of the motions to strike (<u>No. 3:08-CV-1926</u>, Doc. 212; <u>No. 3:08-CV-0737</u>, Doc. 58), filed by defendants, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  The motions to strike (<u>No. 3:08-CV-1926</u>, Doc. 212; <u>No. 3:08-CV-737</u>, Doc. 58), are GRANTED in part, and DENIED in part as follows:

    a.  The following paragraphs are STRICKEN: Doc. 184, Ex. 29A ¶¶ 29-33, Ex. 29B ¶¶ 27-28, 31-33, Ex. 29C ¶¶ 21-22, 24, 26-27, Ex. 29D ¶¶ 25-26, 28-30; Doc. 185, Ex. 29E ¶¶ 29-30, 32-34, Ex. 29F ¶¶ 21-22, 25-27, Ex. 29G ¶¶ 26-30, Ex. 29H ¶¶ 27-31, Ex. 29I ¶¶ 29-30, 32-34, Ex. 29J ¶¶ 29-30, 32-34, Ex. 29K ¶¶ 21-25, Ex. 29L ¶¶ 21-22, 24-26; Doc. 186, Ex. 29M ¶¶ 26-30, Ex. 29N ¶¶ 22-23, 25-26, Ex. 29O ¶¶ 29-30, 32-34, and Ex. 29P ¶¶ 24-25, 27-29.

    b.  The motions are DENIED in all other respects.

2.  The motion for summary judgment (<u>No. 3:08-CV-1926</u>, Doc. 60) as to Anthony Bernardi is GRANTED.

3.  The motions for summary judgment (<u>No. 3:08-CV-1926</u>, Docs. 56, 64, 68, 72, 76, 80, 84, 88, 92, 96, 100, 104, 108, 112; <u>No. 3:08-CV-0737</u>, Docs. 34, 38) are GRANTED in part, and DENIED in part, as follows:

    a.  The motions are GRANTED with respect to plaintiffs' Fourteenth Amendment equal protection and due process claims.

    b.  The motions are GRANTED with respect to plaintiffs' state law wrongful discharge claims.

    c.  The motions for summary judgment against Kenneth Kovaleski (<u>No. 3:08-CV00737</u>, Doc. 34), Dominic Romanini and Gary Propersi (<u>No. 3:08-CV-1929</u>, Docs. 88, 108) are GRANTED with respect to defendants Corey O'Brien and Michael Washo.

    d.  The motions are DENIED in all other respects.

4.  The Clerk of Court is directed to defer entry of Judgment until the resolution of all claims.

5.      A revised scheduling order setting this matter for trial shall issue by
        future order of the court.


                                    S/ Christopher C. Conner
                                    CHRISTOPHER C. CONNER
                                    United States District Judge